Filed 12/27/13  P. v. Motta CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD MOTTA,<br><br>    Defendant and Appellant. | D061951<br><br><br>(Super. Ct. No. SCD217434) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Doris M. LeRoy, for the Defendant and Appellant, under appointment by the Court of Appeal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Randall Einhorn and Theodore M. Cropley, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted Edward Motta of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a); count 1); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2); making a criminal threat (§ 422; counts 3, 6 & 9); false imprisonment by violence, menace, fraud, or deceit (§§ 236, 237, subd. (a); counts 4 & 8); resisting an officer (§148, subd. (a)(1); counts 5 & 11); first degree burglary (§ 459; count 7); and battery of a current or former significant other (§ 243, subd. (e)(1); count 10). The jury found true allegations that in committing the attempted murder and assault, Motta personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)); and the burglary was of an inhabited house (§ 460).

Motta admitted he was previously convicted of felony battery and aggravated battery under Florida Statutes sections 784.041, subdivision (1) and 784.045, subdivision (1)(a)1. The court found those convictions qualified as strikes under California law (§§ 667, subd. (a)(1), 668, and 1192.7, subd (c)); the jury thereafter found true allegations that Motta had suffered those convictions. The court denied Motta's new trial motion and sentenced him to 95 years to life in state prison.

Motta contends: (1) the trial court prejudicially denied his right to self representation guaranteed under the Sixth Amendment of the federal Constitution; (2) the court erroneously denied his new trial motion; and (3) there was no substantial evidence that his Florida convictions qualified as prior strikes under California law and he was

---

1  All statutory references are to the California Penal Code unless otherwise stated.

denied his federal constitutional right to a jury trial on that issue. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

*September 23, 2008 Incident (Counts 7-11)*

S.L. testified that on September 23, 2008, after Motta had argued with her, he became upset and left her house. He returned there, punched out a window, climbed into the house and threatened to snap S.L.'s daughter's neck. S.L. was scared and ran outside. Motta chased her, jumped on her and dragged her back home by the hair. Neighbors called police, who arrived and saw injuries to S.L.'s arms, knees and foot. Because she was afraid, she lied, telling police that Motta had left. However, while police searched the house, Motta ran outside. Police detained him.

*November 11, 2008 Incident (Count 6)*

On November 11, 2008, Motta and S.L. went to dinner at a steakhouse where he accused her of being unfaithful. He loudly threatened to "cut her up in pieces." S.L. went to the bathroom and told two women she was afraid for herself and her children because Motta had threatened to "chop her head off." Motta followed S.L. and tried to force his way into the women's restroom, but the women prevented him from entering. The restaurant staff called police.

*November 23, 2008 Incident (Counts 1-5)*

On or around November 23, 2008, approximately one year after Motta and S.L. began dating, they planned a Hawaii trip. The day before their scheduled departure, Motta shook S.L. and accused her of stealing his car key. She ran to a neighbor's house, tripped and hurt her ankle. She said she would not go to Hawaii, but he apologized and she changed her mind. They checked into a downtown San Diego hotel that night, and after having a drink, Motta said he was tired and lay down. S.L. noticed bruises on her arm from the earlier altercation, and therefore resolved to abandon the Hawaii trip. She packed her luggage and pretended to sleep. When she thought Motta was asleep, she started to leave the room. Just then, Motta grabbed her neck, threw her across the room, jumped on her, strangled her and hit her, bloodying her mouth and face. He threatened to kill her and leave her children motherless. Scared and thinking she was going to die, she left the room and screamed for help. A Marine who was near an elevator saw Motta hit S.L. Some Marines and their spouses took S.L. into one of their hotel rooms. S.L. told them she was afraid Motta would return and kill her.

The Marines followed Motta until police arrived. Motta resisted arrest, even after police had handcuffed him. He denied to police that he carried an identification card or was staying at the hotel, but police found a hotel room key and his identification card on his person. Motta also fought with the medical team who put him in an ambulance. Motta's blood tested positive for alcohol and marijuana.

Police investigating the incident saw blood and clumps of hair on a bed in S.L.'s hotel room. Blood also was on a hallway wall leading from that room to an elevator.

4

Paramedics took S.L. to the hospital, where Dr. James Schwendig, a trauma surgeon, examined her early on November 24, 2008. He saw bruises on her face, scalp and neck. He testified about her more significant injury: "The reason I admitted her and observed her for that 24-hour period was to make sure that the edema or swelling of the airway did not get worse." According to Dr. Schwendig, S.L. did not remember some parts of the hotel incident; therefore, he concluded she possibly had suffered a concussion. He added, "And most significantly . . . the injury that required the hospital admission was a small crack or fracture running through what is called the hyoid bone." Dr. Schwendig noted that S.L.'s CT scan showed that her hyoid bone was not displaced. Dr. Schwendig testified that a direct force to the hyoid bone is required to fracture it, and in 11 years as a trauma surgeon, his only patient with that injury was S.L.

On cross-examination, Dr. Schwendig acknowledged his inability to tell from his examination how S.L.'s hyoid bone became fractured. He also agreed that if S.L. had fallen in a precise way, that could have caused the fracture. Further, Dr. Schwendig emphasized the swelling was his biggest concern: "This particular injury is potentially life-threatening. . . . All I know when I . . . evaluated her that morning is that she had a broken hyoid bone. There was a small amount of swelling with it. I did not know if that swelling would continue to get worse, in which case it could lead to closer [*sic*] of the airway or kill her, or if it had swelled as much as it was going [to] swell and not be a problem." He added: "The swelling is the dangerous thing at this point. . . . The [ear nose and throat] surgeon said it didn't need to be fixed. Now our concern [was] just whether or not the swelling would be a problem."

5

*Defense Case*

S.L. told a private investigator that her relationship with Motta was pleasant at first, but around October 2008, after Motta started using the drug Chantix, Motta's conduct changed and he displayed agitation, homicidal ideation, aggression, anger, paranoia, trouble sleeping, and vivid or unusual dreaming. The investigator testified those were some of Chantix's adverse effects.

Motta testified that in August 2008, a doctor prescribed Chantix to help him quit smoking cigarettes. But the doctor failed to warn Motta about Chantix's side effects or ask about other medication, alcohol or drugs Motta was taking. Motta did not volunteer that information to the doctor. Motta stated that within one month of taking Chantix, he started experiencing vivid nightmares, a shorter tolerance level and aggression. He also accused S.L. of cheating on him, and different people of trying to steal from him. Motta testified he continued taking Chantix every day until November 2008. He acknowledged he never got into any fights with anybody except S.L. during that period.

In August 2008 and September 2008, Motta and S.L. attended couples counseling, and the counselor's notes state Motta had discussed "red flags, his temper." It was decided Motta and S.L. would see separate therapists, which Motta started doing in September 2008. Motta stated in paperwork he filled out at the therapist's office that he was seeking treatment for his anger problem, which he had had since "forever." Specifically, Motta told a psychiatrist that he had engaged in violent incidents as a teenager, and started using drugs in his 20's. In response to a question on the intake form regarding how often he drank more than four alcoholic drinks in a 24-hour period, he

6

responded, "everyday." Motta also told a psychiatrist he had used "cocaine, Benzodiazepine, ecstasy, [and] red wine, two to three glasses a night." Motta admitted during therapy that he gave S.L. gifts, including a car and jewelry, to try to control her. In both September 2008 and November 2008, in the context of Motta's therapy, he signed contracts stating he would not hurt or kill anyone. Motta handwrote on the second contract that he promised not to kill S.L. Notes from Motta's September 2008, meeting with a therapist indicate Motta had recently used cocaine and methamphetamine. Motta denied this at trial, saying he had told the therapist only about his ecstasy use.

Motta testified about the hotel incident as follows: he was tired and went to sleep, and awoke to find S.L. standing over him, apparently trying to awaken him. As a knee jerk reaction, he threw his hands out and hit her in the face and neck. She fell and cried. He realized what he had done and immediately apologized. He acknowledged S.L.'s face was bloody, and he had caused some of her injuries. He testified that when she had refused to go to Hawaii, he was frightened that she might break up with him. But he claimed they packed, and he started taking her home. Near the hotel elevator, he asked her whether she had another lover. She grabbed Motta and insisted she was not cheating. He threatened her and pushed her hand away, and she called for help. Motta denied slapping, punching, choking S.L., or grabbing her hair.

Defense expert Dr. Alan Abrams, a psychiatrist and attorney, interviewed S.L. and Motta, and reviewed police reports of Motta's domestic violence incidents as well as S.L.'s trial testimony, among other documents. Dr. Abrams testified that federal government regulators in 2009 ordered Chantix's manufacturer to include in marketing

7

material a "black box" warning regarding the drug's neuropsychiatric effects. Thereafter, a package insert included with the drug stated that "serious neuropsychiatric symptoms have been reported in patients being treated with Chantix." Other required warnings stated, "These post-marketing reports have included changes in mood, including depression and mania, psychosis, hallucinations, paranoia, delusions, homicidal ideation, hostility, agitation, anxiety and panic, as well as suicidal ideation, suicide attempts and completed suicide." Dr. Abrams concluded, "I think there is a significant likelihood, but not beyond a reasonable doubt, that Chantix played a substantial role in Mr. Motta's paranoia and aggression and violence."

The prosecutor asked Dr. Abrams on cross-examination whether Motta honestly accepted his role in the domestic violence incidents. Dr. Abrams conceded Motta had denied or downplayed several details regarding both the Florida convictions and those involving S.L. Dr. Abrams explained his view regarding Motta's veracity: "[Y]ou know, I work in a prison. I take many things with a grain of salt, and so I don't really grill people to tell me what seems nonsensical on the face of it. My inference was, [Motta] wasn't ready to talk about it." The Prosecutor clarified, "So [Motta's] story to you was nonsensical, obviously?" Dr. Abrams confirmed: "Yeah. The bruises I saw in the police report were not the sort of bruises I would associate with someone being startled."

Dr. Abrams agreed with the prosecutor that even after Motta had stopped using other drugs like methamphetamine, ecstasy, and cocaine, their long-lasting effects on Motta would be similar to some of Chantix's side effects.

8

DISCUSSION

I.

*Motta's Motion to Represent Himself*

Motta contends the court prejudicially erred by denying his motion to represent himself. He concedes "the trial was well along when [he] made his request" to substitute counsel, but claims "significant opportunities to advance the defense case remained."

*Background*

On June 7, 2010, immediately before jury selection began, Motta requested dismissal of retained counsel. During in camera proceedings, he complained he did not understand his defense counsel's theory of the case. The court explained to Motta: "[Counsel] has done everything she can to pursue the only available defense that there is, quite frankly, that I can see based on the evidence. She has done a stellar job. . . . [¶] And the defense is along the lines of unconsciousness, voluntary intoxication, and/or involuntary intoxication." The court denied Motta's motion as untimely. The next day, Motta renewed his motion to relieve retained counsel and requested a continuance. The court again denied the motion as untimely.

On June 9, 2010, the court denied Motta's motion to represent himself, describing it as an "impulsive reaction to [Motta's] frustrated efforts to have an attorney who would do what [Motta] wanted with respect to particular witnesses and evidence." The court analyzed the motion based on the factors set forth in *People v. Windham* (1977) 19 Cal.3d 121, 128-129 (*Windham*), and concluded: (1) Motta's request for self-representation was untimely; (2) Motta had already replaced two attorneys and his current

9

attorney had represented him in approximately 15 status conferences up to that time; (3) the purported lack of rapport between Motta and his counsel was not a sufficient reason to permit Motta to represent himself; (4) Motta had not subpoenaed witnesses, and doing so at that late stage would delay the trial; and (5) Motta "is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his actions and words as to preclude the exercise of a right of self-representation." Addressing Motta, the court elaborated on the last point: "This has occurred continually throughout the trial. [You] [fail] to communicate with [your counsel] and when you do[,] it is argumentative. You are interrupting her during the proceedings. You are shuffling paper around causing a distraction. You are glaring at witnesses, laughing, proceeding as if this proceeding is a joke. Your conduct towards [the victim] is indicative of that."

*Applicable Law*

" 'A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. [Citations.] A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 931-932; *Faretta v. California* (1975) 422 U.S. 806, 815 (*Faretta*).)

"[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the

10

defense himself shall be addressed to the sound discretion of the court.  When such a midtrial request for self-representation is presented the trial court shall inquire sua sponte into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required.  Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.  Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request."  (*Windham*, *supra*, 19 Cal.3d at pp. 128-129.)

In California, there is no bright-line test for determining the timeliness of a *Faretta* motion (*People v. Clark* (1992) 3 Cal.4th 41, 99, abrogated on other grounds as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462); rather, the "reasonable time" requirement is to ensure that a defendant does not "misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. . . . When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted.  When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation without any ability to test the request by a reasonable standard."  (*Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5; *People v. Burton* (1989) 48 Cal.3d 843, 852-853.)

11

An untimely *Faretta* motion is addressed to the trial court's discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 959.) In exercising its discretion, the court should consider certain criteria, including "the quality of counsel's representation . . . the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, *supra*, 19 Cal.3d at p. 128; *People v. Marshall* (1996) 13 Cal.4th 799, 827.) The erroneous denial of a timely *Faretta* request is reversible per se. (*People v. Butler* (2009) 47 Cal.4th 814, 824.) An erroneous denial of an untimely *Faretta* motion, however, is reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Nicholson* (1994) 24 Cal.App.4th 584.)

The California Supreme Court has held that a *Faretta* motion filed two weeks before trial was untimely. (*People v. Lynch* (2010) 50 Cal.4th 693, 719, 726, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) The court held: "[A] trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*People v. Lynch*, at p. 726.) "The fact that the granting of the motion will cause a continuance, and that this will

12

prejudice the People, may be evidence of the defendant's dilatory intent. . . . In most of the cases finding a motion timely as a matter of law, no continuance would have been necessary." (*People v. Burton*, *supra*, 48 Cal.3d at p. 854.)

*Analysis*

Motta's June 9, 2010 *Faretta* motion made during trial was untimely. In light of the trial court's application of the *Windham* factors to the facts of this case, we conclude there was no abuse of discretion. The court expressly concluded Motta had been disruptive and disrespectful to his counsel, the witnesses and victim. The court also noted Motta would require a subpoena for his witnesses, thus necessitating a continuance. Lastly, we point out that this case was complex, as it involved an attempted murder charge, and evaluation of medical testimony regarding Chantix and its side-effects, and the victim's acute injuries. We therefore conclude the court did not err in denying Motta's *Faretta* motion.

## II.

### *Motta's New Trial Motion*

Motta contends the court erroneously denied his new trial motion based on claimed ineffective assistance of counsel.

*Background*

In January 2012, Motta brought a new trial motion under section 1181, partly on the ground he had obtained new evidence showing that his trial counsel was ineffective for failing to investigate a defense relating to S.L.'s hyoid bone injuries. Motta submitted three medical experts' declarations stating S.L.'s CT scans did not show she suffered a

13

fracture, but rather she had an unfused joint, which is a normal condition shared by a substantial number of people.

At the motion hearing, a defense expert attorney testified that Motta's trial counsel prejudicially failed to obtain independent medical expert evaluation of S.L.'s CT scans, thus leaving uncontested Dr. Schwendig's testimony that S.L.'s hyoid bone was fractured.

Motta's trial counsel testified she had consulted the radiologist who performed S.L.'s CT scan and telephoned a doctor in New Jersey about the hyoid bone injury. But she did not forward S.L.'s CT scan results to anyone for an independent evaluation.

The court denied the motion, stating, "Just because [trial counsel] did not present a defense as to the hyoid bone [issue], so to speak, I cannot say that she fell below the standard [set forth in *Strickland v. Washington* (1984) 466 U.S. 668]. [¶] I do believe that the totality of the evidence presented as to the injuries [S.L. sustained], including discussion about the hyoid bone, helped to prove the great bodily injury allegation. . . . [¶] Mr. Motta probably . . . to his detriment did indicate in his testimony that at the time he did feel like killing [S.L.] He said that." The court noted, "[Mr. Motta] did not contend at all the events at the hotel did not occur. He didn't dispute that at all. He disputed [S.L.'s] version." The court continued, "We have the independent witnesses who testified, the observations of the . . . Marines who were there at that hotel. . . . There were harbor police officers who responded to the scene, et cetera." Finally, the court pointed out, "The Chantix evidence[,] I thought[,] was very well presented and very well prepared. And if it had been accepted by the jury . . . it may have resulted in the verdict that [trial counsel] was looking for, but then Mr. Motta decided to testify [and]

14

that may have had some effect on the jury as to the Chantix evidence."[2]  The court

declined to find trial counsel was ineffective.

*Applicable Law*

On a motion for a new trial, the court weighs the evidence independently.  (*People v. Davis* (1995) 10 Cal.4th 463, 523.)  The trial court is guided by a presumption in favor of the correctness of the verdict and proceedings supporting it.  It should not disregard the verdict but instead consider the proper weight to give to the evidence and whether there is credible evidence to support the verdict.  (*Davis*, *supra*, at p. 524.)  A motion for new trial is addressed to the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.)  There is a strong presumption that the trial court properly exercised its discretion, so abuse must appear clear and unmistakable.  (*Davis*, *supra*, at p. 524.)

As explained in *People v. Vines* (2011) 51 Cal.4th 830, courts reviewing claims of ineffective assistance of counsel on appeal defer to trial counsel's reasonable tactical decisions, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (*Id*. at p. 876; *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  Additionally, "[A] reviewing court must adopt the trial court's factual findings if substantial evidence supports them."  (*People v. Fairbank* (1997) 16 Cal.4th

[2]     During posttrial proceedings dialogue with Motta's new counsel, the court alluded to the likely negative effect Motta's testimony had on the jury:  "Again, you weren't there to watch [Motta] attempt to sell his case to the jury when he testified, and it is somewhat ironic that what we have of a trial is just a cold sterile record.  That is reduced to pages, when we don't have video."

1223, 1254.) "[I]n order to demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Vines*, *supra*, at p. 879.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

*Analysis*

Here, in light of Motta's trial counsel's testimony that she contacted two medical professionals in order to investigate S.L.'s hyoid bone injuries, we conclude the trial court did not err in finding counsel did not provide ineffective assistance. But even assuming arguendo that trial counsel's actions fell below prevailing professional norms because she did not present expert medical evidence to counter Dr. Schwendig's testimony regarding S.L.'s fractured hyoid bone, we conclude there is no reasonable likelihood Motta would have received a more favorable outcome absent trial counsel's inaction.

As noted, S.L. testified in detail about the hotel incident, including Motta's threats to kill her, his physical attacks on her and her resulting injuries. Marines witnessed part of Motta's attack on S.L. The spouses of the Marines testified S.L. was afraid Motta would kill her. Dr. Schwendig provided further testimony regarding S.L.'s acute injuries, including her bruised face and swelling near her trachea. Dr. Schwendig consulted another surgeon, who minimized S.L.'s hyoid bone injury. Also, Dr. Schwendig was

16

more concerned about S.L.'s concussion and blocked trachea and admitted her to the hospital for further observation.

Motta himself did not deny hitting S.L. during the hotel incident. To the contrary, a possible motive is inferrable from his testimony and in light of his statement to a therapist that he used gifts to control S.L. After she decided to abandon the Hawaii trip, he feared she would leave him. Although Motta defended his attack as a reflexive reaction to being suddenly awakened, his own expert witness described that defense as "nonsensical." Motta also claimed he had pushed S.L. away when she tried to reassure him she was not cheating. But a Marine disputed Motta's testimony on that point. In light of substantial evidence to support the convictions arising from the hotel incident, the trial court did not err in rejecting Motta's claim of ineffective assistance of counsel.

Motta points out that during closing arguments, the prosecutor, in referring to the great bodily injury allegations, stated: "The fractured hyoid, clearly serious. It was life-threatening and very, very serious. And I don't think the defense will get up here and try to say it was not a serious injury." Motta concludes, "Thus, the purported hyoid bone fracture, *alone*, was the basis for the allegations of great bodily injury. And, the hyoid bone fracture was an important basis upon which the prosecutor urged the jury to find [Motta] guilty of attempted murder, and of assault by means of force likely to produce great bodily injury." But "[t]he mere argument of counsel is not evidence." (*People v. Kinder* (1954) 122 Cal.App.2d 457, 463.) Given the totality of Dr. Schwendig's testimony set forth above, we are not bound by the prosecutor's comment on that testimony.

17

Motta contends his trial counsel should have fully investigated S.L.'s injury to better cross-examine Dr. Schwendig. In our view, trial counsel's cross-examination of Dr. Schwendig, however limited, was effective, as she managed to elicit concessions that Dr. Schwendig did not know exactly how S.L. fractured her hyoid bone, and S.L.'s possible fall could have caused it.

Motta also contends the court should have granted his new trial motion because the evidence that S.L.'s hyoid bone was not fractured constituted newly discovered evidence. Motta relies on *People v. Martinez* (1984) 36 Cal.3d 816 (*Martinez*), in which the defendant moved for a new trial on the ground of newly discovered evidence. (*Id*. at p. 820.) The trial court denied the motion, finding defense counsel was not diligent in discovering the new witness. (*Id*. at p. 821.) In its analysis, the Supreme Court first considered the significance of the proffered witness, noting that numerous cases hold that a new trial motion should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant. (*Id*. at p. 823.)

In ruling on a motion for new trial based on newly discovered evidence, the trial court considers whether: (1) the evidence, and not merely its materiality, is newly discovered; (2) the evidence be not cumulative merely; (3) the evidence is such as to render a different result probable on a retrial of the cause; (4) the party could not with reasonable diligence have discovered and produced it at the trial; and (5) these facts are shown by the best evidence of which the case admits. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) Ultimately, a motion for new trial is a matter for the trial court's discretion. Once the court has denied the motion, its exercise of discretion will not be

18

overturned on appeal absent a manifest abuse of discretion. On appeal, we assess this question based on the facts and circumstances of the underlying case. (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.)

A comparison to the facts of *Martinez*, *supra*, 36 Cal.3d 816 is illustrative of why the "newly discovered evidence" in this case was not sufficient for the trial court to reopen the probation revocation hearing. In *Martinez*, the defendant was convicted of second degree burglary. (*Id*. at p. 819.) The only evidence against the defendant in *Martinez* was a palm print found on a newly painted drill press at the scene, a business. (*Id*. at p. 822.) One of the employees of the business testified he had painted the drill press the day before the burglary. (*Id*. at p. 819.) After trial, a defense investigator located a witness who could offer testimony the drill press was painted up to two weeks before the burglary. (*Id*. at pp. 820-821.) The *Martinez* court concluded that although the jury may not have believed the second employee, that employee's testimony was exculpatory and may have raised a reasonable doubt, particularly in light of the limited evidence supporting the defendant's conviction. (*Id*. at pp. 823-824). Thus, the court held the trial court abused its discretion in not granting a new trial motion. (*Id*. at p. 824.) Here, in contrast to *Martinez*, we cannot say that Motta's proffered "newly discovered evidence" contradicted the strongest evidence against him. In light of the cumulus of evidence outlined above, medical testimony that S.L.'s hyoid bone was not fractured would not have raised a reasonable doubt sufficient to undermine Motta's convictions.

19

## III.

### *Motta's Florida Prior Convictions*

#### A.

Motta contends the court erroneously denied his posttrial motion brought on the separate ground that no substantial evidence showed his Florida prior convictions qualified as strike offenses under California law.

*Background*

In September 2001, Florida authorities charged Motta with unlawfully and intentionally striking S.F., his cohabitant, and causing her great bodily harm during a May 2001 incident. The affidavit of probable cause regarding that incident stated that S.F. and Motta got into an altercation and he strangled her, punched her in the face and banged her head against a wall. The arresting officer observed lacerations on S.F.'s neck, her black and blue eye, and bruised face. S.F.'s attending nurse stated S.F. had suffered a ruptured ear drum. The authorities also charged Motta with striking and intentionally causing S.F. great bodily harm during an August 2001 incident. In the affidavit of probable cause for the second incident, a police officer stated he saw S.F. in a parking lot with red marks around her neck and blood coming from her lips and nose. She also had a large hematoma on her face. S.F. told the police officer that Motta had attempted to strangle her.

During an April 2002 change of plea hearing in Florida, the prosecutor orally set forth the factual basis for the two charges, repeating the information in the certificates of probable cause. Immediately afterwards, the prosecutor asked the court to have Motta

20

admit to those facts. Motta's counsel replied, "[Motta] would like to plead no contest; and he would agree that if those facts were presented to a jury, he could in fact be found guilty" of the charges. The court discussed but declined to permit an "*Alford* plea," in which the defendant does not admit the facts underlying the charged offense, but pleads guilty to take advantage of a favorable recommendation from the prosecution and because he recognizes he might be convicted if the case were tried. (*N.C. v. Alford* (1970) 400 U.S. 25, 91.) Instead, the court limited Motta's options to pleading guilty or going to trial. Motta responded, "I plead guilty, your honor." The court noted, "[Alright], just for the record, the defendant and his attorney . . . have had a colloquy off the record between the two of them. . . . I just wanted to note this plea is entered with additional consultation with counsel." The prosecutor next warned Motta that he risked maximum possible state prison sentences of 15 years and five years respectively on the two counts. Motta stated he understood the consequences of his plea.

After Motta's plea, the court received testimony from S.F., who had traveled from France to attend the proceedings, and whose ability to attend the subsequent sentencing hearing was uncertain. S.F. testified about the harm Motta's aggression had caused her: His strangulation produced a cyst, which was operated on and removed. Doctors detected thyroid cancer and removed her thyroid gland, requiring her to take hormone replacement for the rest of her life. She needed two surgeries to straighten her broken nose. She had a perforated eardrum, which affected her hearing. She also was receiving psychological counseling approximately three times a week. In May 2002, the Florida

21

court sentenced Motta to 18 months in state prison and placed him on probation for 10 years.

During the trial proceedings in the present case, the People produced various documents, including the Florida affidavits of probable cause, Motta's change of plea form, the transcript of the Florida change of plea proceedings, and the Florida court's sentencing order. The court, relying on the language of the Florida and California statutes, ruled Motta's Florida convictions qualified as strikes under California law, specifically, section 667, subdivision (d): "First of all, as to the personal issue, he was the only defendant in the Florida case. As to the factual basis, the argument that [the] prosecutor's statement is hearsay, that's not a very viable argument. By pleading in the Florida case, [Motta] accepted the factual basis stated by the prosecutor on the record and that was accepted by the court. [¶] The argument about personal infliction versus causation is an argument without distinction, quite frankly. If you carefully review the Florida statute and compare it to California law and review the cases that deal with the issue, including the Florida cases, you will see clearly that the Florida statute actually requires more elements than the California statute does. And you compare and contrast that with the felony battery in Florida, it certainly qualifies. [¶] As for the aggravated battery . . . Florida actually requires an additional element, that being specific intent, thus the aggravated battery has an additional element not required in California. So my ruling is that the prior convictions do qualify under California law and as serious violent felony priors."

22

*Applicable Law*

"Under the Three Strikes law, a prior conviction from another jurisdiction constitutes a strike if it is 'for an offense that includes all of the elements of the particular felony as defined in subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7.' " (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 810.) "[T]he relevant inquiry in deciding whether a particular prior conviction qualifies as a serious felony for California sentencing purposes is limited to an examination of the record of the prior criminal proceeding to determine the nature or basis of the crime of which the defendant was convicted." (*People v. McGee* (2006) 38 Cal.4th 682, 691.) "To make this determination, the court may consider the entire record of the prior conviction as well as the elements of the crime." (*People v. Avery* (2002) 27 Cal.4th 49, 53.) When a defendant challenges the sufficiency of the evidence to sustain the trial court's finding that the prosecution has proven all elements of the enhancement, we must determine whether substantial evidence supports that finding. " 'The test on appeal is simply whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the enhancement beyond a reasonable doubt.' " (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 129.) In making this determination, we review the record in the light most favorable to the trial court's findings. (*Ibid.*)

In 2002, Florida Penal Code section 784.045 provided: "(1)(a) A person commits aggravated battery who, in committing battery: [¶] 1. Intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement; or [¶] 2. Uses a deadly weapon."

23

In California, "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice," personally uses a firearm, or personally uses a dangerous or deadly weapon is a serious felony. (§ 1192.7, subds. (c)(8) & (c)(23).) To "personally inflict" an injury, the defendant must act to directly cause the injury, and not just proximately cause it. (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347.)

The hearsay exception for adoptive admissions is codified in Evidence Code section 1221, which provides: " 'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.' " Thus, " ' "[w]hen a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence." ' " (*People v. Jennings* (2010) 50 Cal.4th 616, 661.)

"Whether the statement constitutes an adoptive admission is 'determined upon the facts and circumstances therein presented.' " (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1121.) For a statement to be an adoptive admission, there must be sufficient evidence to sustain a finding that (1) the defendant heard and understood the statement under circumstances normally calling for a response, and (2) the defendant adopted the

24

statement as true by the defendant's words or conduct. (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

This court has held: "Generally, both parties to a plea agreement are expected to pay careful attention during a plea colloquy to ensure the formalities necessary for its validity are met and the record accurately reflects the parties' agreement. The possibility of future consequences, including the application of habitual offender statutes, further necessitates the parties ensure the record accurately reflects the factual basis for the plea. Therefore, . . . a defendant would normally and reasonably be expected to object to or respond to the prosecution's factual recital if the factual recital did not accurately reflect the circumstances of the offense to which the defendant was pleading guilty or no contest." (*People v. Sample* (2011) 200 Cal.App.4th 1253, 1265.)

*Analysis*

Here, as in *People v. Sample*, *supra*, 200 Cal.App.4th 1253, we conclude there is sufficient evidence to support the court's finding the prosecutor's recital fell within the hearsay exception for an adoptive admission and the trial court in this case properly considered the prosecution's recital in determining that Motta's prior Florida convictions qualified as prior strike convictions under California law. Where, as here, the plea colloquy shows the defendant confirmed the factual basis for the plea and made admissions upon entering the plea, those factual admissions are made part of the convictions. (*Shepard v. United States* (2005) 544 U.S. 13, 20-21; see also *United States v. Rosa* (2d Cir. 2007) 507 F.3d 142, 158.) As such, they may be used to establish the conduct supporting the convictions.

25

In entering his plea, Motta did not challenge the prosecutor's factual basis for the crimes, thus admitting the conduct that makes the offenses serious felonies in California; that is, that he inflicted great bodily injury to S.F. and directly caused her injuries. Accordingly, there was substantial evidence supporting the trial court's finding that defendant's prior convictions were serious felonies. Motta's contrary arguments, including that his trial counsel was ineffective for failing to object to the documents the prosecutor introduced regarding the Florida proceedings, are unavailing.

## B.

Motta contends he was entitled to a jury trial on the issue of whether he had committed the alleged prior convictions. He acknowledges the California Supreme Court has ruled that defendants are not entitled to a jury trial on the issues of the precise facts of a prior conviction, and we are bound by that case. (*People v. McGee*, *supra*, 38 Cal.4th at pp. 686, 706-707; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) He raises the issue here to preserve it for federal review.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.
McDONALD, J.

26