[No. B074931. Second Dist., Div. One. Apr. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL B. NICHOLSON et al., Defendants and Appellants.

**COUNSEL**

David L. Kelly and Anthony J. Dain, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sharon Wooden Richard and S. Allison Hughes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VOGEL (Miriam A.), J.**—Paul B. Nicholson and Michael L. Goldsberry were convicted of robbery and first degree felony murder. They appeal,

contending their unequivocal and unconditional motions to represent themselves should have been granted. We agree and therefore reverse and remand for a new trial.

## FACTS

Valentin Montesdeoca's partially buried body was found during the early evening hours of September 8, 1991, in a wash near the El Charro Bar in Palmdale. All of his personal effects were missing, including his Pulsar watch and Security Pacific Bank ATM card—but a key to room 18 at the Sherwood Motel in Palmdale was found underneath his body.

Defendant Goldsberry lived in room 18 of the Sherwood Motel and his friend, Defendant Nicholson, used to live at the same motel. During the early hours of September 8, two witnesses saw Goldsberry and Nicholson at the Palmdale branch of the Security Pacific Bank using an ATM machine (at two different times), and the bank's records established four withdrawals from the victim's account between about 6:30 and 7:30 that morning.

Later the same morning, Goldsberry and Nicholson flashed a "wad" of money to Lillian King, Goldsberry's neighbor at the Sherwood Motel. Over a period of a few hours, they told King that Goldsberry had lost the key to room 18 and had hurt his hand while entering his room through a window, showed her a gold Pulsar watch and, when she asked where they got the money, they told her "they robbed a Mexican and beat him around," with Nicholson bragging that he and Goldsberry "beat the man and beat him and beat him until he gave us his ATM card and the PIN number." When King asked where they had done this and whether anyone had seen them, one of them said it was near the Charro, a Mexican bar, and "the only one that seen them was a nigger on a bicycle and a couple Mexicans and they weren't going to say anything anyway." After the beating, they had returned to the scene to look for Goldsberry's motel key.

King called the police. Nicholson and Goldsberry were arrested and both were charged with murder and robbery, with felony-murder special-circumstance allegations (and two prior felony conviction allegations against Nicholson). Eventually, trial was set for August 4, 1992. On that date, the court (Hon. Haig Kehiayan) announced the schedule for trial—the jurors were not to be sworn until August 10, at which time they would be asked to complete questionnaires, and voir dire would begin on August 13. As explained in more detail below, it was on August 4 that the *Faretta* motions were made and denied. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) The trial started on time but, for reasons

unrelated to the issue before us, there was a mistrial and, later, a second mistrial.

The third trial was completed (before a different judge, Hon. Ronald S. Coen). Evidence of the facts outlined above was presented to the jury, along with evidence that the victim died from blunt force trauma to the head and asphyxia (he had been strangled by hand). He had been beaten with fists and some other blunt instrument, and he was buried facedown while still alive. Some of the wounds were inflicted with sufficient force to break the hand of the assailant. Bloodstains found on Nicholson's and Goldsberry's clothes could have come from the victim but not from either defendant.

The defendants were convicted as charged, after which Nicholson admitted the priors. Both were sentenced to prison for life without the possibility of parole, with an additional 10 years for Nicholson for the priors. Nicholson and Goldsberry appeal.

## DISCUSSION

Nicholson and Goldsberry contend they should have been permitted to represent themselves at trial. They are right, and we therefore do not reach their other claims of error.

### A.

Trial was set for Tuesday, August 4, 1992, as day 0 of 10. On August 4, after conferring with counsel, the trial court announced the schedule—the jury panel would be sworn on August 10 (the following Monday) and asked to complete questionnaires, which would be returned on August 11. Jury selection would begin on August 13. After other pretrial details were discussed and after the court was told there was no possibility of a plea bargain, Nicholson's attorney told the court that his client had "inquir[ed] about the possibility of becoming pro per and starting all over again, which I indicated to him in no uncertain terms would not necessarily mean it would start all over if the court would even entertain pro per status." Goldsberry's attorney joined, explaining that "Goldsberry has indicated to me his desire to enter pro per status and represent himself from this point forward." The deputy district attorney had no objection: "As long as they are both ready to go to trial by next Monday, I couldn't care less."

In response, the trial court asked the prosecutor to leave the courtroom (which he did) to "give these gentlemen their opportunity to indicate to the court why they believe that in an LWOP case plus 10 on one of them that

they should be allowed to represent themselves." Goldsberry explained, "Your Honor, I feel that I want to represent myself. My lawyer feels we cannot win this case, and I feel that we can."

Nicholson agreed: "I have been told we ain't got no chance at all winning this case. I feel like everything, with all time considered, I'd rather go through it myself. That way I'd know exactly what is going on." In response to questions from the court, Nicholson explained that he had represented himself once before (in 1986), apparently with success (he told the court that case was "dropped"). When asked what he knew about the law, Nicholson said, "Not much, but I do a lot of reading." When the trial court suggested they would have difficulty doing their own research while in custody and asked why they thought they could do a better job than their lawyers, Nicholson said, "Can't do no worse. They both feel we ain't got a chance in hell to win." When it was his turn, Goldsberry told the court he had no "pro per background at all" but he had been arrested before and, "I understand the court . . . as far as how things go, . . . but not specifically the law."

This was the trial court's response: "So you are asking me to let two babes-in-the-woods walk into professional prosecutors . . . . You are dealing then with the possibility of an appeal. My job here is, basically, I'm a referee. There is a baseball game or football game or something going on, and I'm the referee, and I have got to give both sides, you and the People of the State of California, a level playing field. With you facing what you are facing, you are entitled to make your decision to go to trial. I have no quarrel with that. And that is what I'm here for to see to it that you get a fair trial. I don't believe either one of you is going to get a fair trial without being represented by adequate counsel. Either one of you have anything you want to say?"

Goldsberry did: "If I'm going to go through this, and my lawyers say that I'm not going to win this case, and the prosecutors say I'm not going to win this case, and I'm going to go through this not knowing what is going on, I'd rather do it myself. It would be on me[,] by me. That way I would know what is happening. . . . This is my life."

The dialogue continued:

"THE COURT: It's your life. You are going to know better what is going on by having an attorney with you at your side, and the other thing is you wait until the last minute. What do you expect me to do? Why do you come up with this at the last minute?

"DEFENDANT GOLDSBERRY: We have just been told what is going to be proceeding today.[1]

"THE COURT: Well, . . . your attorney telling you that the case is bad is part of their job to tell you what they believe is going on.

"DEFENDANT GOLDSBERRY: I understand.

"THE COURT: But you have not convinced me they are going to lay down on the job, either one of them.

"DEFENDANT NICHOLSON: What they are saying it's beyond hope. There ain't no way at all.

"THE COURT: And you want to ignore their—

"DEFENDANT GOLDSBERRY: They are saying we are not going to win.

"DEFENDANT NICHOLSON: I'd rather go about it, find out for myself.

"THE COURT: Well, you see, your druthers are one thing. My job is to see to it that you get a fair trial, and I find that you will not get a fair trial, either one of you, by representing yourselves. . . . Also, I find that your motion is made at a very late date. So that is another reason why I'm denying it. Okay, motions are denied. . . ."

The defense lawyers assured the court of their willingness to give their clients a good defense. Goldsberry's attorney concluded with the following comments: "I don't know what else the court wants to hear. This isn't a *Marsden* hearing. [(*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)] I don't think Mr. Goldsberry is upset with the nature of the representation or feels we have a conflict of interest. He wants to exercise his constitutional right to represent himself. I find him articulate. I find him intelligent, insightful, certainly he knows the facts of the case better than anyone. But the court rules as the court will." The court repeated its ruling that the motions were denied.

## B.

█ A defendant has a federal constitutional right to represent himself if he voluntarily and intelligently elects to do so. (*Faretta* v. *California, supra,*

---

[1]From other parts of the record, it appears both defendants had remained hopeful that the prosecutor would reconsider his "no offer" position and accept a plea to straight first degree murder. He did not, and had earlier that morning informed the court, "There is no offer."

422 U.S. 806, 818-836 [45 L.Ed.2d 562, 572-582].) To invoke an unconditional right of self-representation, however, the defendant must assert the right "within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Although the courts have refused to identify a single point in time at which a *Faretta* motion becomes untimely rather than timely (*People v. Clark* (1992) 3 Cal.4th 41, 99 [10 Cal.Rptr.2d 554, 833 P.2d 561]), the difference is significant for two reasons.

First, when the request is made within a reasonable time before the commencement of trial, ". . . the court must permit the defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*People v. Windham, supra*, 19 Cal.3d at p. 128.) "However, once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court." (*Id.* at p. 128; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 790-791 [191 Cal.Rptr. 249].) Second, the denial of a pretrial motion is a matter of constitutional magnitude, whereas the denial of a midtrial motion is not. (*People v. Windham, supra*, 19 Cal.3d at pp. 127-128; *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 [259 Cal.Rptr. 669, 774 P.2d 698].)

■ Assuming without deciding that August 4 was the day trial commenced, the court had discretion to deny the motions.[2] ■ In exercising that discretion, the trial court was required to consider (1) the quality of counsels' representation, (2) the defendants' prior proclivity to substitute counsel, (3) the reasons for the request, (4) the length and stage of the proceedings, and (5) the disruption or delay which might reasonably be expected to follow the granting of such a motion. (*People v. Windham, supra*, 19 Cal.3d at p. 128; *People v. Burton* (1989) 48 Cal.3d 843, 853 [258 Cal.Rptr. 184, 771 P.2d 1270].) ■ The record quoted at length above tells us what we need to know.

First, there is no question in this case about the quality of counsels' representation.

---

[2]When counsel stated their appearances on August 4, no one actually announced "ready" and the plan to defer swearing the jury to August 10 raises a question about whether trial "commenced" on August 4 or August 10. Since the defendants win under either approach, we discuss only the stricter discretionary rule, treating August 4 as the day trial commenced. (But see *People v. Gephart* (1979) 93 Cal.App.3d 989, 998 [156 Cal.Rptr. 489] [for jeopardy purposes, trial commences when the jury is sworn].)

Second, there is no prior (or any) proclivity to substitute counsel, not even a concurrent alternative request for new counsel (as appears so often in the reported decisions).[3]

Third, the defendants knew they were facing certain conviction and life sentences without the possibility of parole, knew their attorneys didn't think there was any chance of winning and, as each told the court, "I'd rather do it myself [because that way] I would know what is happening."

Fourth, it was a short trial, only eight days from start to finish. Had the motions been granted, the planned use of jury questionnaires would have provided Nicholson and Goldsberry with one day shy of a week to prepare, which would have been adequate—there were no complex legal or evidentiary questions in this case and, as counsel told the court, the defendants knew the facts better than anyone.

Fifth, there was no reason to believe either defendant would disrupt the trial or delay the proceedings. There was no request for a continuance and no hint that one would be forthcoming if propria persona status was granted.[4] Both defendants addressed the court with respect and nothing in the record suggests they would have behaved in a disruptive manner.

## C.

The question is whether, on this record, the denial of the motions was an abuse of discretion. Clearly, had Nicholson or Goldsberry asked for a continuance or otherwise suggested or expressed an intent to delay the proceedings, the trial court would have been justified in denying their *Faretta* motions. But they didn't, and the court wasn't.

Every case upholding a discretionary denial of a *Faretta* motion involves a request for a continuance (or some other delaying tactic) or a demonstrated proclivity to substitute counsel or both. For example:

---

[3]At oral argument, the People told us that both defendants had failed to appear for a pretrial hearing and counsel suggested they did so in order to delay the proceedings. Implicit in the argument was the suggestion that Nicholson and Goldsberry were free on bail. They were not. They have been in custody since they were arrested and Goldsberry's one "miss-out" was because the sheriff's department failed to deliver him to court, which the trial court obviously found was a failure to appear "with sufficient excuse." Nicholson never failed to appear.

[4]When Nicholson's attorney told the court his client wanted to represent himself, a reference was made to "starting all over again." Counsel went on to say that he told his client that if the court permitted him to represent himself, things would not "start all over." Since neither defendant thereafter (or at any relevant time) asked for anything to be done over, we do not attribute any meaning to counsel's comment.

In *People* v. *Clark, supra,* 3 Cal.4th at pages 98-100, the defendant's "mercurial temperament" and his "proclivity to substitute counsel" supported denial of his *Faretta* motion. In *People* v. *Burton, supra,* 48 Cal.3d at page 853, the defendant said he was not ready to go to trial and needed an unspecified period for preparation. In *People* v. *Moore* (1988) 47 Cal.3d 63, 78-81 [252 Cal.Rptr. 494, 762 P.2d 1218], the defendant told the court, " 'I couldn't go to trial this afternoon, but I would request the Court that if I go pro. per. to give me time to prepare my defense.' " (*Id.* at p. 78.) In *People* v. *Hamilton* (1985) 41 Cal.3d 408, 419-421 [221 Cal.Rptr. 902, 710 P.2d 981], vacated and remanded on instructional grounds in *California* v. *Hamilton* (1986) 478 U.S. 1017 [92 L.Ed.2d 734, 106 S.Ct. 3328], the defendant twice moved to have his attorneys relieved, then filed a third motion to relieve counsel or proceed in propria persona, then asked instead for co-counsel status, then moved to have new counsel appointed, and then renewed his *Faretta* motion. On this record, the court (not surprisingly) found the defendant "was grasping at anything to delay the proceedings." (*People* v. *Hamilton, supra,* 41 Cal.3d at p. 420.)[5]

We have found only two reported decisions in which the trial courts denied *Faretta* motions when the defendants were ready to proceed without a continuance, *People* v. *Herrera* (1980) 104 Cal.App.3d 167, 174-175 [163 Cal.Rptr. 435], and *People* v. *Tyner* (1977) 76 Cal.App.3d 352, 355 [143 Cal.Rptr. 52]. In both cases, the denials resulted in reversals.

### D.

 The trial court's discretion to deny a motion made at the commencement of trial or later exists to "prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." (*People* v. *Burton, supra,* 48 Cal.3d at p. 852.) It follows ineluctably that where self-representation is requested for a legitimate reason, where there is no request for a continuance and where there is no reason to believe there would be any delay or disruption, the trial court's denial of a *Faretta* motion is an abuse of discretion.

---

[5]There are many similar cases. For example, in *People* v. *Ruiz, supra,* 142 Cal.App.3d at pages 786-787, 789, the defendant's *Faretta* motion was made as an alternative to a *Marsden* motion and accompanied by a request for a continuance. In *People* v. *Perez* (1992) 4 Cal.App.4th 893, 904 [6 Cal.Rptr.2d 141], the defendant's *Faretta* motion followed an unsuccessful *Marsden* motion and would have required a continuance. In *People* v. *Morgan* (1980) 101 Cal.App.3d 523, 529 [161 Cal.Rptr. 664], the defendant's *Faretta* motion was part of a pattern of "waffling" on questions of representation which tended to cause delay and disrupt the proceedings. In *People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 650-655 [209 Cal.Rptr. 809], the defendant's *Faretta* motion was accompanied by a request for six months to prepare his case. In *People* v. *Harris* (1977) 73 Cal.App.3d 76, 81-82 [140 Cal.Rptr. 697], the defendant asked for a three-week delay.

We summarily reject the People's suggestion that the "potential" for delay existed because, had the court granted the motions, a continuance would have been required. First, the People's reliance on *People* v. *Wilkins* (1990) 225 Cal.App.3d 299, 304-305 [275 Cal.Rptr. 74], is misplaced—*Wilkins* holds only that a refusal to grant a continuance, requested *after* a discretionary *Faretta* motion had already been granted, is a due process violation. (Compare *People* v. *Windham*, *supra*, 19 Cal.3d at p. 128 [the delay must "reasonably be expected" to follow from granting the motion].) Second, acceptance of the People's position would mean a discretionary *Faretta* motion would never be granted, since the "potential" for delay is always greater when a defendant represents himself. Clearly, something more than a mere "potential" is required—either a history of delaying tactics (prior requests for new attorneys or whatever) or a request for a continuance at the time the *Faretta* motion is made.

This reversal and retrial (and the expense to the taxpayers) could probably have been avoided had the trial court taken its cue from the deputy district attorney (who told the court he didn't care whether the defendants represented themselves as "long as they are both ready to go to trial by next Monday"), and simply inquired of Goldsberry and Nicholson about whether they would need some additional time to prepare. The odds are they would have answered affirmatively. Instead, the court focused on the defendants' lack of legal ability, an irrelevant consideration under *Faretta* (*People* v. *Hamilton*, *supra*, 41 Cal.3d at p. 420),[6] and failed altogether to make a record in support of its order. (*People* v. *Windham*, *supra*, 19 Cal.3d at pp. 128-129 ["Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request"].) Like it or not, *Faretta* is the law of the land and when a trial court is unable to persuade a defendant to accept representation by a lawyer, the defendant is constitutionally entitled to represent himself.

### E.

The People suggest we ought to find the error harmless. That we cannot do.

 The erroneous denial of a *timely* motion for self-representation is an error of constitutional magnitude and is subject to a rule of per se reversal. (*People* v. *Tyner*, *supra*, 76 Cal.App.3d at p. 356.) The erroneous denial of an "*untimely*" motion is not. (*People* v. *Rivers* (1993) 20 Cal.App.4th 1040,

---

[6]Likewise, the trial court's idea of a "level playing field" has nothing to do with *Faretta*, nor does "the possibility of an appeal" (which in any event follows every criminal conviction, as night follows day).

1050-1051 [25 Cal.Rptr.2d 602] [erroneous denial of a midtrial *Faretta* motion is reviewed under the harmless error test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 (299 P.2d 243)].) ■ On the facts of this case, we cannot say the error was harmless.

■ *Faretta* is based on the belief that the state may not constitutionally prevent a defendant from "controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant." (*People* v. *Windham, supra,* 19 Cal.3d at p. 130.) ■ Had Nicholson and Goldsberry been permitted to control their own fate, the evidence against them would have been no less overwhelming. But we simply cannot discount the fact that it might have been to their advantage to conduct voir dire and to present opening statements and closing arguments, thereby giving the jury an opportunity to hear from them (without the inconvenience of cross-examination). (Cf. *People* v. *Tyner, supra,* 76 Cal.App.3d at p. 356; *People* v. *Herrera, supra,* 104 Cal.App.3d at p. 175.) While it seems safe to say the defendants could not under any circumstances have been acquitted, they might have been able to avoid a true finding on the special circumstance allegation.

Furthermore, the timing issue in this case is, as indicated at the outset, a close call. Had we taken the position that the motions were timely because trial had not commenced on August 4 and that it did not in fact begin until August 10, the erroneous denial of the motions would per se require reversal. All things considered, we cannot say the error was harmless.

### DISPOSITION

The judgments are reversed and the cause is remanded to the trial court for a new trial.

Spencer, P. J., and Masterson, J., concurred.

A petition for a rehearing was denied May 17, 1994.