Filed 12/14/15  P. v. Gomez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDGAR GOMEZ,<br><br>    Defendant and Appellant. | B257511<br><br>(Los Angeles County<br>Super. Ct. No. BA398363) |

            APPEAL from a judgment of the Superior Court of Los Angeles County, Rand S. Rubin, Judge.  Affirmed in part and reversed in part.

            Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

            Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant Edgar Gomez of three counts of assault with a deadly weapon, and one count each of kidnapping, carjacking, and kidnapping during the commission of a carjacking. The jury also found true the criminal street gang enhancement allegations related to the assaults. Gomez argues that all of the convictions should be reversed because the trial court erroneously denied his motion on the first day of trial to represent himself, and that his kidnapping and carjacking convictions should be reversed because they are lesser included offenses of kidnapping during the commission of a carjacking. We conclude that any error in the denial of Gomez's motion for self-representation was harmless, but that the convictions for kidnapping and carjacking should be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Assaults*

On April 28, 2012, at approximately 3:45 a.m., Rico Hayes, his boyfriend Raymel Turner, and Turner's friend Jerry Garnett were walking on Pico Boulevard from a roller skating rink to a bus stop. All three men were African-American. At some point Garnett stepped away from Hayes and Turner, and went around the corner to make a private phone call. Suddenly, Hayes and Turner saw Garnett running back around the corner, followed by a Latino man, Gomez, who was chasing him. Garnett was calling Turner's name and screaming for help. Hayes and Turner ran from the bus stop to come to Garnett's aid.

Garnett ran into a wall or gate and collided with Gomez, who put his hands on Garnett as if he was frisking him. Gomez, who initially was outnumbered three to one, kicked Turner in the knee, as two more Latino men came running around the corner to join Gomez. Gomez said he was a member of the 18th Street criminal street gang and assumed a fighting stance. Using derogatory terms for members of Blood and Crip

2

criminal street gangs, Gomez said, "Fuck slobs" and "Fuck crabs."  Hayes, who was wearing red clothing generally associated with Blood gangs, and Turner, who was wearing blue clothing generally associated with Crip gangs, told Gomez they were gay and did not "gangbang."[1]  According to Turner, telling gang members they were gay usually diffused a potential gang confrontation and allowed him and his friends to leave without incident.  When Turner's statement did not dissuade Gomez from wanting to fight, Hayes told Gomez he had a friend in the 18th Street Gang.  Gomez, however, continued to threaten the three of them.

At this point a white mini-van drove up to the six men as they faced each other on the street.  Two men came out of the mini-van, and the driver handed out knives to Gomez and his companions.  Gomez got a knife, waved or "flashed" it at Hayes, and made slicing motions in an attempt to put the knife in Hayes' chest.  Gomez also swung his knife at Turner.  Hayes, who was much taller than Gomez, stood his ground for a moment to protect Turner and Garnett, who were smaller men.  Now that Gomez had a knife, and Hayes, Turner, and Garnett were surrounded and outnumbered five to three, a "red flag went off" in Hayes' mind and he knew "nothing good could come from the situation [they] were in."  Hayes said he was not afraid of Gomez, but he was afraid of what Gomez could do with a knife.  Turner yelled "Run!" and the three friends started running down the middle of Pico Boulevard, followed by Gomez and his associates.  Hayes, Turner, and Garnett ran to a house with a locked gate, jumped over the gate, hid behind some cars, and called the police.

---

[1]     Hayes testified that he was wearing red clothing that night "because I'm comfortable with what I wear and I like red and I believe I should be able to wear whatever I want."  Hayes said that Turner was dressed in "all blue."  As for Garnett, Hayes testified, "I don't remember how he was dressed, but the way he dressed is more, how do I say it, white boyish . . . .  He likes to wear colored shirts and plaid shirts."  Turner testified, "I don't wear red.  I don't wear blue.  I don't wear . . . large clothes.  I don't hang out with gang members, so I do everything to prevent that."

Several months later, Hayes identified Gomez in a photographic line up and wrote, "This guy in this picture chased [Garnett] first and put him up against the gate. He also kicked [Turner]. Then he was handed a knife to stab me." Turner also identified Gomez and wrote, "He ran up, kicked me, and he pulled out a knife." At trial, the People presented expert testimony that Gomez's attack on Hayes, Turner, and Garnett was for the benefit of and in association with the 18th Street criminal street gang.

B.      *The Kidnapping and Carjacking*

A warrant issued for Gomez's arrest. Law enforcement conducted surveillance and found him on June 7, 2012, riding as a passenger in the back seat of a green and tan Toyota near the Santa Monica Freeway, Interstate 10. When the officers in one of the police cars following the Toyota activated the exterior overhead lights to initiate a stop, the Toyota drove to a dead-end street, made a U-turn, and stopped. Gomez, wearing a black T-shirt, black shorts, and black socks without shoes, jumped out of the car and ran into a tunnel under the freeway. Officers gave chase, yelled at Gomez to stop running, but lost him in some bushes.

Gomez made it onto the freeway, where Miriam Sheriff was driving in heavy traffic, about to exit at La Brea Avenue. Her front windows were down, and she could hear police helicopters above her. Suddenly, Gomez jumped into her car through the passenger window, landed on the floor, pushed her foot on the accelerator, and told her to "go." Sheriff told Gomez she had a husband and daughter, and begged him not to hurt her. Gomez said he would not hurt her. Gomez stayed on the floor for a while, finally climbed up on the seat, and, after borrowing her phone, told Sheriff to exit at Fairfax Avenue and drive him to a fast food restaurant on Vermont Avenue and Martin Luther King Boulevard.

Sheriff, who has a background in social work and described herself as "empathetic," testified at trial that during the ride she began to talk to Gomez about his life and his problems. She testified that Gomez did not threaten her and was not aggressive towards her, and that once Gomez said he was not going to hurt her, she did

4

not feel threatened by or afraid of him. When they arrived at the restaurant, Gomez obtained $30 from a friend, gave it to Sheriff for gas, and thanked her.

Sheriff did not call the police. She was surprised when the police found her and came to her father's home to interview her. Police officers testified that Sheriff was afraid of Gomez and had pleaded with him not to hurt her because she had a family. Sheriff told the officers that she did not call the police because Gomez told her not to and she feared that Gomez knew her license plate and would be able to harm her if she contacted the police. One of the officers testified that Sheriff was nervous, frightened, worried, and shaken up during his interview with her. Sheriff identified Gomez in a photographic line up.

### C. *The Charges, Verdict, and Sentence*

The People charged Gomez with three counts of assault with a deadly weapon, in violation of Penal Code section 245, subdivision (a)(1),[2] for Gomez's attacks on Garnett, Turner, and Hayes. The People also charged Gomez with kidnapping, in violation of section 207, subdivision (a), carjacking, in violation of section 215, subdivision (a), and kidnapping during the commission of a carjacking, in violation of section 209.5, subdivision (a), for his encounter with Sheriff. The People alleged in connection with the assaults against Garnett, Turner, and Hayes that Gomez committed the assaults for the benefit of, at the direction of, and in association with a criminal street gang with the intent to promote, further, and assist criminal conduct by gang members, pursuant to section 186.22, subdivision (b)(1). The information also included four counts of robbery, three of which the court dismissed before trial because the People announced they were unable to proceed. The People also alleged that Gomez was released from custody on bail or recognizance, within the meaning of section 12022.1, when he committed the kidnapping and carjacking crimes.

---

[2] All statutory references are to the Penal Code.

The jury found Gomez guilty on the three counts of assault with a deadly weapon against Garnett, Turner, and Hayes, and found true the criminal street gang allegations. The jury also found Gomez guilty of kidnapping, carjacking, and kidnapping during the commission of a carjacking, with respect to Sheriff. The jury acquitted Gomez of the remaining count of robbery.

The trial court sentenced Gomez to a total of 16 years 4 months, plus life in prison with the possibility of parole on the conviction for kidnapping during the commission of a carjacking. Gomez appealed.

## DISCUSSION

### A.    *The Right to Self-Representation and the Standard of Review*

A defendant has the right under the Sixth and Fourteenth Amendments of the United States Constitution to waive his or her right to counsel and to represent himself or herself if he or she is competent to do so and invokes that constitutional right voluntarily, knowingly, and intelligently. (*Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*); *People v. Lynch* (2010) 50 Cal.4th 693, 721-722, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637; see *People v. Stanley* (2006) 39 Cal.4th 913, 931-932.) The defendant must unequivocally assert the right of self-representation within a reasonable time prior to the start of trial. (*People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*).) If the motion for self-representation is timely, unequivocal, knowing, and intelligent, the court must grant it. (*People v. Williams* (2013) 58 Cal.4th 197, 252-253; *People v. Lynch*, *supra*, 50 Cal.4th at p. 721; *People v. Jackson* (2009) 45 Cal.4th 662, 689.)

While a timely, unequivocal motion for self-representation invokes "the nondiscretionary right to self-representation" under *Faretta*, an untimely motion for self-representation does not. (*People v. Lawrence* (2009) 46 Cal.4th 186, 191-192; see *People v. Lynch*, *supra*, 50 Cal.4th at pp. 721, 722 ["[a] trial court must grant a defendant's request for self-representation" if it is timely, but has discretion to deny the

6

request "if untimely"]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1365 [if the motion is untimely, "self-representation no longer is a matter of right but is subject to the trial court's discretion"].)  Finally, although an erroneous denial of a timely motion for self-representation is reversible per se (*People v. Williams*, *supra*, 58 Cal.4th at p. 253; *People v. Butler* (2009) 47 Cal.4th 814, 824), an erroneous denial of an untimely motion for self-representation is reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (See *People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058; *People v. Nicholson* (1994) 24 Cal.App.4th 584, 594-595; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050.)

  B.     *Gomez's Motion for Self-Representation Was Untimely*

In assessing whether a motion for self-representation is timely, the court considers the totality of the circumstances.  (*People v. Lynch*, *supra*, 50 Cal.4th at p. 725.)  "Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation."  (*Id.* at p. 726.)  The court may also consider whether the defendant will need a continuance.  (See *Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.)  "Moreover, a trial court rarely should grant such a motion on the day set for trial.  [The California] Supreme Court has 'held on numerous occasions that *Faretta* motions made on the eve of trial are untimely.'  [Citation.]  A motion made that close to the day set for trial is 'extreme' [citation] and now is disfavored."  (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1277.)

The trial court correctly determined that Gomez's motion to represent himself was untimely because he made it on the day of trial, just as the trial was about to begin and the prospective jurors were about to enter the courtroom.  As the California Supreme Court stated in *Windham*, "a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself  . . . without some showing of

7

reasonable cause for the lateness of the request." (*Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5; see *People v. Valdez* (2004) 32 Cal.4th 73, 102 [motion for self-representation made "moments before jury selection was set to begin" was untimely]; *People v. Frierson* (1991) 53 Cal.3d 730, 742 [motion for self-representation made "on the eve of trial over 10 months after counsel had been appointed" was untimely]; *People v. Moore* (1988) 47 Cal.3d 63, 79 ["we specifically stated in *Windham*, that 'a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request'"]; *People v. Howze* (2001) 85 Cal.App.4th 1380, 1397 [motion for self-representation made "on the eve of trial" or "within three calendar days of the commencement of trial" was untimely]; *People v. Rudd* (1998) 63 Cal.App.4th 620, 626 [although there is no bright line rule, "[w]hen California Supreme Court authority has been applied, motions for self-representation made on the day preceding or on the trial date have been considered untimely"].)  Other circumstances supporting the trial court's finding that Gomez's request was untimely included that Gomez's attorney was ready to proceed to trial, as evidenced by the fact that he did so a few moments later, and the fact that Gomez had multiple pretrial opportunities (at least 10 pretrial hearings at which he was present) to assert his right of self-representation.  (*People v. Lynch*, *supra*, 50 Cal.4th at p. 726.)

C.      *Any Error in Denying Gomez's Untimely Motion for Self-Representation*
         *Was Harmless*

As Gomez correctly contends, where, as here, the court determines the defendant's request for self-representation is untimely, the trial court must inquire into the reasons for the request and exercise its discretion in light of several factors identified in *Windham*. Those factors include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, *supra*, 19 Cal.3d at p. 128;

accord, *People v. Lynch*, *supra*, 50 Cal.4th at p. 722, fn. 10.) Although the court must make the *Windham* inquiry, the court's failure to do so does not necessarily mean the court abused its discretion. (See *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6; *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354-1355.) A reviewing court will affirm an exercise of discretion in denying an untimely motion for self-representation if there is substantial evidence in the record supporting the inference that the trial court considered the *Windham* factors, even if the trial court failed to make the inquiry *Windham* requires. (See *People v. Dent* (2003) 30 Cal.4th 213, 218; *People v. Marshall* (1996) 13 Cal.4th 799, 827-828; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206.)

The transcript of the hearing on Gomez's request to represent himself is as follows:

"The Court: [The] matter has been transferred here for trial. Are there any 402's we need to deal with before we bring a jury panel down?

"[Counsel for Gomez]: Your Honor, before we do that, my client has indicated to me that he wishes to proceed pro per.

"The Court: Well, the matter is here for trial. Is he ready to continue with the trial today?

"[Mr. Gomez]: No. No, Your Honor.

"The Court: I mean, today is eight of ten, sent out for trial. I take it it's eight of ten.

"[Counsel for Gomez]: Eight of ten, Your Honor.

"The Court: Eight of ten, sent out for trial. This case has been going on since April of 2012, so it's a year and a half. Are you ready to start picking a jury on your own?

"[Mr. Gomez]: Umm, I don't think I'm fully prepared for that.

"The Court: Well, then you waited too long to go pro per. The request to go pro per is denied."

The court did not make the required *Windham* inquiry into the reasons for the request or ask questions to obtain information that would allow the court to exercise its discretion in light of the *Windham* factors. The court asked Gomez if he was ready to proceed with the trial at the time and pick a jury, and Gomez answered both questions in the negative. But the court did not ask Gomez whether he would have been ready to pick a jury and start the trial the next day ("nine of 10") or the day after that ("10 of 10"). The court did not ask Gomez any questions about his attorney's representation, any prior requests to substitute counsel or represent himself, how soon Gomez could be ready to proceed with the trial if he represented himself, or anything else about the circumstances of his request. Nor, other than noting how long the case had been pending, did the court make any findings or comments on the *Windham* factors, such as the quality of the representation by Gomez's attorney, prior requests by Gomez to represent himself, or any disruption or delay that would result from granting Gomez's motion.

As noted, even in the absence of a proper inquiry into and an explicit discussion of the *Windham* factors, a reviewing court will not find an abuse of discretion if the record contains substantial evidence to support an inference that the trial court considered the *Windham* factors. Here, however, there is no substantial evidence that the trial court considered the *Windham* factors, and the People do not cite to any. There is no evidence that counsel for Gomez's representation was deficient or inconsistent with Gomez's wishes and instructions in any way, that Gomez's reasons for requesting to represent himself were invalid or designed to cause delay, or that Gomez had any prior proclivity to substitute counsel. It would be a stretch on this record to conclude, despite the court's failure to inquire into or make any findings on the *Windham* factors, that there is substantial evidence from which we can infer the court did consider those factors.

Nevertheless, any error in the trial court's denial of Gomez's untimely motion for self-representation was harmless because it is not reasonably probable that Gomez would have achieved a more favorable result had he represented himself. (See *People v. Rogers*, *supra*, 37 Cal.App.4th at p. 1058; *People v. Nicholson*, *supra*, 24 Cal.App.4th at pp. 594-595.) As a practical matter, self-represented defendants are rarely able to obtain a better

10

outcome than an experienced attorney can obtain. (See *Faretta*, *supra*, 422 U.S. at p. 834 ["[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts"]; *People v. Rivers*, *supra*, 20 Cal.App.4th at p. 1051 ["[i]t is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel"].) Gomez does not argue that his attorney was ineffective or deficient, or suggest what he would have done differently than his attorney did in order to obtain a more favorable result. Indeed, Gomez's attorney was able to obtain an acquittal of the one robbery charge that remained after the People had dismissed the other three. Moreover, although Gomez did not represent himself at trial, he did testify and was able to give his version of the events and tell his side of the story to the jury in his words. It is hard to see how he could have made a better presentation to the jury by representing himself while he was testifying.

Finally, the evidence against Gomez relating to the assaults on Hayes, Turner, and Garnett, and the kidnapping and carjacking of Sheriff, was compelling and virtually undisputed. The testimony of Hayes and Turner was detailed and uncontradicted. In his testimony, Gomez did not dispute any of the material facts of the attacks with the knife, but merely explained he was "high that day" and was unsure about how the specific events of that evening unfolded. Similarly, there was little conflict or ambiguity in the evidence of Gomez's flight from police and kidnapping and carjacking of Sheriff. Gomez testified that he ran onto the freeway after he had been chased because it was "just what I do," that he dove into Sheriff's car and put his hand on her leg and told her to "go," and that Sheriff asked him not to hurt her because she had a husband and a daughter. Although Gomez testified that his unsolicited and unwanted freeway encounter with an unsuspecting driver, who happened to have a background in social work and enjoyed talking to strangers, somehow blossomed into a voluntary ride for a newfound friend, the investigating officers who interviewed Sheriff explained that she was concerned for her physical safety because Gomez could use her license plate number to find her. The jury

11

did not believe Gomez's version of these events, and it is not reasonably probable they would have if Gomez had represented himself at trial. [3]

D. *Gomez's Convictions for Kidnapping and for Carjacking, Both Lesser Included Offenses of Kidnapping During the Commission of a Carjacking, Must Be Reversed*

The jury convicted Gomez of kidnapping during the commission of a carjacking in violation of section 209.5, subdivision (a), and the trial court sentenced him to life in prison with the possibility of parole. The jury also convicted Gomez of kidnapping in violation of section 207, subdivision (a), and carjacking, in violation of section 215, subdivision (a), and the trial court sentenced Gomez to one year eight months on each count and stayed both sentences under section 654.

Gomez argues, the People agree, and we conclude this was error. As the People concede, kidnapping and carjacking are lesser included offenses of kidnapping during the commission of a carjacking. (See *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1416 ["[i]t is well settled that carjacking is a necessarily included offense of kidnapping during a carjacking"]; *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1368 [the elements of kidnapping "appear to be included within the elements of kidnapping during a

---

[3] Gomez cites language from the court's opinion in *People v. Nicholson, supra,* 24 Cal.App.4th 584 stating "it might have been to [the defendants'] advantage to conduct voir dire and to present opening statements and closing arguments, thereby giving the jury an opportunity to hear from them (without the inconvenience of cross-examination)." (*Id.* at p. 595.) Perhaps. But the standard under *People v. Watson*, *supra*, 46 Cal.2d 818 is not whether it might have been advantageous, but whether it is reasonably probable that, had Gomez conducted voir dire and presented his opening statement and closing argument, he would have obtained a better result. And, as the court in *People v. Percelle* (2005) 126 Cal.App.4th 164 explained in distinguishing *Nicholson*, even if Gomez had personally participated in voir dire, opening statement, and closing argument, "the jury was still bound to decide the case on the evidence, the greater part of which was undisputed." (*People v. Percelle*, at p. 177.)

12

carjacking"]; see also *People v. Medina* (2007) 41 Cal.4th 685, 701 [attempted kidnapping is a lesser included offense of kidnapping during a carjacking].)  Therefore, Gomez's convictions for the lesser included crimes of kidnapping and carjacking must be reversed.  (See *People v. Pearson* (1986) 42 Cal.3d 351, 355 ["multiple convictions may *not* be based on necessarily included offenses"]; *People v. Dowdell*, *supra*, 227 Cal.App.4th at p. 1416 ["[w]hen a defendant is convicted of a greater and a lesser included offense, reversal of the conviction for the lesser included offense is required"].)

**DISPOSITION**

The convictions for kidnapping and for carjacking are reversed, and the judgment is otherwise affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

ZELON, J.

13