Filed 7/9/24  P. v. Borjas CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEOVANNI BORJAS,<br><br>    Defendant and Appellant. | B325816<br><br>(Los Angeles County<br>Super. Ct. No. BA453097) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Geovanni Borjas pled no contest during trial to two counts each of murder and rape and one count of kidnapping. He contends the trial court erred in denying his requests to represent himself prior to and during the trial. We conclude that appellant's requests to proceed in propria persona were untimely and that the trial court did not abuse its discretion in denying them. We therefore affirm.

## PROCEDURAL HISTORY

In February 2018, a Los Angeles grand jury indicted appellant on five counts: counts one and two, respectively, charged appellant with the murder and rape of M. Lozano (Pen. Code, §§ 187, subd. (a), 261, subd. (a)(2))[1] and counts three through five charged appellant with the murder, kidnapping to commit rape, and rape of B. Guzman. (§§ 187, subd. (a), 209, subd. (b)(1), 261, subd. (a)(2)). The indictment further alleged that appellant committed the murders while engaged in the commission of rape (for counts one and three) and kidnapping (for count three) (§§ 261, 207, 209, 190, subd. (a)(17)). The indictment also alleged a multiple murder special circumstances within the meaning of section 190.2, subd. (a)(3).

Appellant was arraigned in May 2018 and entered a not guilty plea on all counts. The prosecution advised the court that it was seeking the death penalty. The court ordered certification of preliminary proceedings in a capital case and the matter was subsequently continued several times for completion of the record. In November 2018, the court granted defense counsel's motion to continue the matter to March 2019 for pretrial conference. The court then continued the matter several more times and ultimately set trial for May 2020. In April 2020, the matter was continued again due to the COVID-19 pandemic.

In November 2020, the court granted appellant's request to relieve his counsel, appointing bar panel counsel Seymour Amster as lead defense counsel. In March 2021, the prosecution reported that it would no longer be seeking the death penalty. The matter was set for pretrial conference on June 11, 2021. In September 2021, defense counsel requested to continue the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

matter to January 2022. The prosecution objected and the court trailed the matter to October 29, 2021.

At the October 29, 2021 hearing, the court heard and denied appellant's *Marsden*[2] motion to substitute counsel. The court granted a defense motion to continue the matter, setting it for January 21, 2022. The court later granted additional defense motions to continue the case to March 25, April 15, and then May 5, 2022. The court then set trial for June 20, 2022. At a hearing on June 10, 2022, defense counsel announced he was ready for trial. The court heard and denied appellant's renewed *Marsden* motion and continued trial to August 12, 2022.

On August 12, 2022, the date set for trial, defense counsel again announced he was ready for trial. However, he informed the court that appellant wanted to bring a *Faretta*[3] motion to proceed in propia persona. The prosecutor asked to continue the trial to September 22 for scheduling reasons. The court cautioned appellant that if he could not be ready for trial by the new date, the court would deny his motion to represent himself. Appellant told the court that he would "try." The court responded, "Try is not going to do it." The court told appellant that he could fill out the form to represent himself and the court would review it, but that his counsel would continue to represent him if appellant was not ready for trial. Appellant responded that he was not being properly represented and "now I have no choice but to go pro per." The court reminded appellant that it had denied his prior *Marsden* motions to substitute counsel and reiterated that it would not grant a continuance. The court told appellant that he could "spend some time thinking about it" to decide whether he could be ready, but denied the motion as untimely, explaining that "[i]t's right before trial. It would necessitate a continuance." Appellant then responded that there was too much work to do for him to be ready for trial. The court repeated that it was denying the motion "since you cannot unequivocally tell me that you'll be ready for trial."

---

[2]     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[3]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

At the next hearing on August 26, the court noted that appellant had indicated he wanted to retain experts for trial, but there was "no possibility" that if the court appointed those experts that they would be prepared for the trial date. For that reason, the court stated, "I'm not going to let you go pro per. . . . We're not going to continue this case. And since you can't be ready . . . I'm finding it's an untimely request." Appellant again told the court that he wanted to represent himself and planned to move for a continuance and the court responded "that's exactly the reason you're not going pro per."

At a hearing on September 22, appellant requested another *Marsden* hearing. In the *Marsden* hearing, the court found that no circumstances had changed and denied the motion.

Jury selection began on October 3, 2022 and continued over multiple days through October 25. At the end of the day on October 10, 2022, appellant told the court that he did not agree with the denial of his *Faretta* motion. The court responded that it had denied the motion and appellant did not need to keep raising it, as he was "just wasting time."

The parties gave opening statements on October 25, 2022. Appellant again sought to bring a *Marsden* motion or to proceed in pro per. The court denied both motions. During the *Marsden* hearing, appellant stated that he wanted to go pro per if he did not receive a new attorney. The court again found appellant's *Faretta* motion untimely. Appellant responded that he did not "need any time," but the court stated that it was too late because trial had begun.

The prosecution presented witnesses on October 25, 26, and 27. Appellant made another *Marsden* motion midday on October 26. During that hearing, the court admonished appellant that it was a "continuing problem" that he did not listen to the court. The court also cautioned appellant that his repeated motions questioning every tactical decision by his counsel were "becoming abusive." The court denied the motion. On October 27, after the conclusion of testimony for the day, defense counsel informed the court that appellant was willing to plead no contest to all charges.

The following court day, October 31, 2022, appellant confirmed that he wanted to enter a plea. As both counsel informed appellant of the possible maximum and minimum sentences in the case, the prosecutor told appellant,

"don't smirk and roll your eyes. We're taking a plea here on a very serious case. Do you understand that?" Appellant responded, "I understand my attorney is not defending me whatsoever, and all of a sudden he has something to say." Appellant and the prosecutor began arguing, but were stopped by the court. When asked to acknowledge that he had ample opportunity to speak with his attorney, appellant answered, "No" and then continued, "my attorney has not properly advised me in a lot of ways." When the court stated that it would proceed with the trial, appellant again said he was ready to plead. The prosecutor told appellant to "quit playing games." The court took a recess and told appellant's counsel to speak to him about the plea process.

After the break, the prosecutor told the court that appellant had "made various offers over the course of the last several days, last week, and, I think, even maybe a month ago," but the district attorney's office had rejected those offers. The prosecutor again told appellant to "stop smirking at me." Appellant stated there were witnesses he would like subpoenaed into court for his defense, but when the prosecutor stated she could issue the subpoenas if appellant wanted to continue with trial, appellant declined, stating that he wanted to continue with the plea. After appellant continued to argue, the court took another recess until after lunch, suggesting that appellant again speak with defense counsel. The court advised appellant that "if you don't want to [plead] or you're going to be ambiguous about it, we're not going to take it."

After lunch, the prosecutor told the court that appellant indicated he wanted to represent himself and was "ready to do so." The court responded, "it's untimely. The fact that there is no continuance. . . . He's already tried that with me, and it's already been denied." The prosecutor told the court that neither she nor defense counsel were comfortable continuing with the plea, because appellant "keeps injecting issues into the process. [¶] And I completely understand what the court is saying because I completely agree that he's malingering and playing all of us and has manipulated the entire system and is trying to turn this trial into a circus." The court responded that allowing appellant to represent himself was "subject to the court's discretion anytime after trial starts. [¶] And I agree with you. He is

5

constantly looking for an edge, something to do. I don't trust him in front of the jury. [¶] The bottom line is he doesn't listen to me. He talks when he's told not to talk. He's not going to represent himself in this court." The court indicated that the trial would proceed. Appellant then told the court that he wanted "to proceed with the plea . . . I thought I had made it clear already." The court cautioned appellant that it would give him one more chance, and directed the prosecutor to begin the plea again. Appellant stated he understood the consequences of his plea, pled no contest to the five charges against him, and admitted the special allegations. The court found there was a factual basis for the plea, accepted the plea, and discharged the jury.

The court sentenced appellant on count one (murder) to life without the possibility of parole, on count two (rape) to the high term of eight years, on count three (murder) to a consecutive term of life without the possibility of parole, on count four (kidnapping) to a consecutive life term with the possibility of parole, and on count five (rape) to the high term of eight years. The court stayed the sentences on counts two, four, and five pursuant to section 654. Appellant timely appealed. He requested a certificate of probable cause, which the court granted.

## FACTUAL BACKGROUND

We briefly summarize the evidence presented at trial as relevant to the issues presented or helpful for background. The trial was adjourned for appellant's plea before the prosecution had completed its case-in-chief.

On April 24, 2011, 17-year-old Lozano left her family home in the Lincoln Heights neighborhood of Los Angeles. She never returned home. On April 26, 2011, the day after Easter, Los Angeles Police Department (LAPD) officers discovered Lozano's body at the bottom of an embankment next to an off-ramp for the southbound I-5 freeway. Lozano's body was in a fetal position inside a plastic container, partially nude. At trial, an investigating LAPD detective opined that based on the location of the body and the shattering of the container, the victim was killed elsewhere, transported, then dumped over the side of the freeway off-ramp onto the dirt embankment below. Police believed Lozano might have been the victim of a sexual assault and collected evidence using a sexual assault kit.

6

In December 2011, 22-year-old Guzman was living with her mother, sisters, and two daughters in Lincoln Heights. On December 26, 2011, Guzman told her mother she was not feeling well and left home around 7:30 p.m. to walk to the store. An employee of the Rite Aid in Lincoln Heights, who knew Guzman as a regular customer, testified that Guzman purchased cough drops around 8:00 p.m. When Guzman did not return home that evening, her family called the police. The LAPD, assisted by Guzman's family, conducted a missing person investigation for the next month.

On January 26, 2012, LAPD officers discovered Guzman's body on a hillside embankment next to an on-ramp for the southbound SR-2 freeway. Her body was mostly covered by leaves, with her nude buttocks and feet exposed. The LAPD collected evidence using a modified sexual assault kit, but were unable to administer the full kit given the state of decomposition of the body. An investigating LAPD detective opined at trial that Guzman's body was moved to that location after she was killed and was partially buried in an attempt to conceal the body.

The investigation into both murders continued for several years. In 2014, detectives were alerted that DNA from semen collected in Lozano's case matched DNA from semen collected in Guzman's case.[4]

## DISCUSSION

Appellant contends the trial court erred in denying his repeated motions to represent himself. The Attorney General responds that the trial court properly found the requests were untimely and the court was well within its discretion to deny them. Having reviewed the record, we find no error.

---

[4] Based on opening statements, the prosecution also intended to present evidence at trial that appellant's DNA matched DNA collected from both victims. The prosecution also planned to present evidence that appellant lived near both victims in Lincoln Heights and worked at a health clinic where both women were patients. In addition, the prosecution intended to play recordings of appellant confessing to the crimes against Lozano and Guzman during a conversation with an undercover informant in jail.

## A.   Legal Principles

A defendant has a federal constitutional right to represent himself. (*Faretta, supra*, 422 U.S. 806.)  However, "*Faretta* itself and later cases have made clear that the right of self-representation is not absolute." (*Indiana v. Edwards* (2008) 554 U.S. 164, 171.)  In order to invoke an unconditional right to self-representation, a defendant must assert it unequivocally and "within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*).)  Accordingly, "when a motion to proceed pro se is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so." (*Id.* at p. 128, citing *Faretta, supra,* 422 U.S. at p. 836.)

However, a motion not made within a reasonable time before trial is "addressed to the sound discretion of the court." (*Windham, supra*, 19 Cal.3d at p. 128.)  The *Windham* court further explained that when presented with an untimely *Faretta* motion, the trial court should "shall inquire sua sponte into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required." (*Ibid.*) The factors relevant to the court's exercise of discretion include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Ibid.*; see also *People v. Frierson* (1991) 53 Cal.3d 730, 742.)  As the court noted, "a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice." (*Windham, supra*, 19 Cal.3d at p. 128, fn. 5.)

## B.   Windham *factors*

Appellant does not contend that his *Faretta* motions made prior to the start of trial were timely. Instead, he argues that the court failed to hold a "*Windham* hearing" to assess the relevant factors related to its exercise of discretion, and that this failure requires reversal.

We agree that the court did not err in finding that appellant's *Faretta* motions made prior to trial were untimely.  Appellant first moved to represent himself on August 12, 2022, the day set for trial.  This motion on

8

the eve of trial was not made within a "'reasonable time prior to the commencement of trial.'" (*Frierson, supra*, 53 Cal.3d at p. 742.) As such, the court had discretion whether to grant appellant's request. Appellant contends that the court failed to conduct the inquiry required by *Windham*. We reject appellant's contention that the court was required to put on the record its assessment of the *Windham* factors. The *Windham* court expressly "decline[d] to mandate a rule that a trial court must, in all cases, state the reasons underlying a decision to deny a motion for self-representation which is based on nonconstitutional grounds," as long as there was "a sufficient record on appeal in such cases in order to sufficiently evaluate alleged abuses of discretion when motions for self-representation are denied." (*Windham, supra*, 19 Cal.3d at p. 129, fn.6.)

Given the trial court's finding the motion was untimely, it was required to follow the procedure mandated in *Windham* by inquiring about the factors underlying appellant's request to represent himself. The trial court did not expressly conduct such an inquiry. However, the record contains sufficient evidence to support the court's exercise of its discretion, as all of the factors weigh in favor of the court's denial of the motion. For the first factor, the quality of defense counsel's representation, the court had repeatedly assessed defense counsel's performance in hearing and denying appellant's *Marsden* motions, ultimately cautioning appellant that he was abusing the process by challenging every decision his counsel made. Similarly, appellant had demonstrated a prior proclivity to substitute counsel, the second factor, in bringing repeated *Marsden* motions leading up to trial.

As for the third factor, the reasons for the request, the appellant's failure to make a *Faretta* motion until the date set for trial, after his latest *Marsden* motion was denied, supports an implied finding that the request was a delay tactic. Indeed, this finding was further supported by the court's later statements that appellant was "constantly looking for an edge," did not listen to the court, and could not be trusted in front of the jury.

The fourth and fifth factors, the length and stage of the proceedings and the expected disruption or delay, also support the court's denial of the motion. At the time of appellant's first *Faretta* motion in August 2022, the case had been pending for over four years, appellant and his counsel had

requested and received multiple continuances over the past year, and the matter was set to begin trial imminently. Further, appellant admitted that he would need a continuance in order to proceed in pro per. In *People v. Perez* (1992) 4 Cal.App.4th 893, the court upheld the denial of an untimely *Faretta* motion under similar circumstances. The trial court in that case did not specifically inquire into the *Windham* factors, but the appellate court concluded that "there were sufficient reasons on the record to support the lower court's ruling. The trial court was aware of the quality of the representation defendant was receiving since his *Marsden* motion had been denied the day before, he had previously made three motions to substitute counsel, trial was about to commence, and granting the motion would have required a continuance. Moreover, defendant's failure to make the *Faretta* motion the day before in connection with his *Marsden* motion supported the implied finding that defendant's request was merely a delay tactic." (*Id*. at pp. 904–905; see also *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354 ["a trial court's exercise of discretion in denying an untimely *Faretta* motion is properly affirmed if substantial evidence in the record supports the inference that the court had those factors in mind when it ruled"]; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206 ["[W]hile the trial court may not have explicitly considered each of the *Windham* factors, there were sufficient reasons on the record to constitute an implicit consideration of these factors"].)

Here, we conclude that the record supports the trial court's implicit consideration of the *Windham* factors and the resulting denial of appellant's untimely *Faretta* motions.

### C. Mid-trial requests

Appellant also made several requests to represent himself after trial had begun. At that point, he told the court he did not need a continuance and could proceed immediately. He therefore argues that these mid-trial requests were "timely" and should have been automatically granted. We disagree.

Appellant's contention that any *Faretta* motion that does not include a request for a continuance is "viewed as being timely" conflates two issues. First, the court should determine whether the defendant has made the *Faretta* motion within a "reasonable" time prior to trial, in order to determine

whether that request was timely. If the defendant's request was timely and meets the other *Faretta* requirements (e.g., unequivocal, voluntarily and intelligently made), then the inquiry ends and the defendant's constitutional right to self-representation attaches. (See *Windham, supra*, 19 Cal.3d at p.128.) If it was untimely, then the court assesses the *Windham* factors in order to properly exercise its discretion. (*Ibid.*) While the fact that appellant did not require a continuance mid-trial is relevant to these factors, it does not render the motion timely. The cases appellant cites do not support his argument to the contrary. In *People v. Tyner* (1977) 76 Cal.App.3d 352, 355, the court found that appellant's motion for self-representation was timely when it was made *prior to trial* and without a request for a continuance. In *People v. Nicholson* (1994) 24 Cal.App.4th 584, the defendants moved to represent themselves on the day set for trial, but before trial had begun. (*Id.* at p. 588 [jury panel to be sworn six days after trial date].) The court stated that it was denying the *Faretta* motions based on a finding that the defendants "will not get a fair trial, either one of you, by representing yourselves. . . . Also, I find that your motion is made at a very late date." (*Id.* at p. 590.) The *Nicholson* court concluded that the trial court had discretion to deny the motions, given their timing, but that the denial of the motions was an abuse of discretion based on the *Windham* factors. (*Id.* at p. 592.) Specifically, neither defendant had shown a proclivity to substitute counsel or requested a continuance of trial, and the record showed "no reason to believe either defendant would disrupt the trial or delay the proceedings." (*Ibid.*) The defendants also gave a credible explanation for their desire to represent themselves—they "knew they were facing certain conviction and life sentences without the possibility of parole, knew their attorneys didn't think there was any chance of winning and, as each told the court, 'I'd rather do it myself [because that way] I would know what is happening.'" (*Ibid.*) Similarly, in *People v. Herrera* (1980) 104 Cal.App.3d 167, the Court of Appeal assumed that the defendant's *Faretta* request, made on the morning of trial but before the jury was impaneled, was untimely. The court found that the record did not support denial of the motion based on the *Windham* factors, including that the trial court denied the motion by stating, "if

11

[defendant] says he is crazy ... he can't represent himself." (*Id.* at pp. 174-175.)

As such, while the fact that appellant was no longer requesting a continuance was relevant to the court's consideration of the *Windham* factors, his *Faretta* motions made after jury selection had begun were still untimely. Nor does the absence of a continuance alter our assessment of the court's exercise of discretion, as the remaining factors continue to weigh against granting the motion. Moreover, the comments by the court and the prosecutor regarding appellant's disruption of proceedings by failing to listen, smirking, and playing games, as well as the court's comment that it did not trust appellant with the jury, support the finding that appellant was likely to disrupt the proceedings if allowed to represent himself. Thus, the trial court was entitled to deny his *Faretta* motions.

## DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

CURREY, P.J.

ZUKIN, J.

12