Filed 5/27/16  P. v. Green CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TRAJAN PAUL GREEN,<br><br>    Defendant and Appellant. | G052131<br><br>(Super. Ct. No. FWV1301852)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Stephan G. Saleson, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott Taylor and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

INTRODUCTION

Defendant Trajan Paul Green appeals from the judgment entered after a jury found him guilty of attempted robbery, robbery, and assault. He contends the trial court erred by denying his requests to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), and by allowing the prosecutor to elicit facts surrounding Green's prior felony conviction for grand theft during her cross-examination of Green. He also contends the trial court erred by finding his prior robbery conviction in Arkansas constituted a strike under the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), and by denying his motion to strike his prior strike conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

We affirm Green's convictions for attempted robbery, robbery, and assault. The trial court did not abuse its discretion by denying Green's untimely *Faretta* requests; the record supports the court's findings that the requests were intended to unjustifiably delay court proceedings and otherwise obstruct the orderly administration of justice. The trial court did not abuse its discretion by allowing the prosecutor to elicit facts regarding Green's prior grand theft conviction after he minimized those circumstances during his direct examination.

We reverse the trial court's finding that Green's 1995 conviction in Arkansas for robbery constituted a strike under the Three Strikes law because, as acknowledged by the Attorney General, it is supported by insufficient evidence. We remand the matter to the trial court for further proceedings. (See *People v. Barragan* (2004) 32 Cal.4th 236, 239.)

FACTS

John Doe[1] and his wife owned Kimmy's Nails in Rancho Cucamonga.  On May 29, 2013, at 7:52 p.m., John Doe sat on the sofa in the store, waiting for his wife to finish a customer's nails, so they could close the store and go home.  A skinny, tall African-American man, wearing black clothing, a mask, and gloves that had holes in the fingertips, walked into the store.  He pointed a gun at John Doe, and said, "[d]on't panic, just give me the money."  He was holding a black bag with drawstrings.

The man then walked over to John Doe's wife, pointed the gun at her, and repeated, "[d]on't panic; give [me] the money."  She told him, "[o]kay, okay, okay, I give you money."  She opened a drawer and gave him about $300.  After he directed her to put the money in the bag he was holding, the man turned around and ran out the front door.  John Doe ran out of the store and watched the man run "really fast" toward Sixth Street.  When he lost sight of the man, John Doe ran back into the store and called the police.

Robert Coffman was stopped at a red light near Kimmy's Nails when he saw a person, who was wearing a black hoodie and black pants, "bolting" out of Kimmy's Nails.[2]  He also saw a man come out of the front door of the business, who appeared to Coffman to be "scared to death," looking in the direction of the person running away.  Coffman turned into a parking lot and started to follow that person.  Coffman briefly lost sight of the person until Coffman got to Sixth Street where he saw a person, who fit "the same description" as the person he had seen moments before, running diagonally across Sixth Street, toward an industrial complex, and into a driveway.  Coffman drove down that driveway and looked to his left, where he saw a person, who was wearing the same clothing as the person whom he had been following,

---

[1]  None of the three victims used his or her real name at trial.  We therefore refer to the victims as John Doe, John Doe's wife, and a customer.

[2]  Coffman testified that the weather was "[p]retty warm" at the time.

3

standing next to the driver's side of a parked white vehicle that had been backed into a parking stall. Coffman parked in front of the vehicle, thereby blocking it.

Coffman saw the person, who had something leathery covering his face[3] and was wearing a hoodie, open the car door and get into the white vehicle. While sitting in the car, the person looked at Coffman, threw his head down, and then raised his head back up; he was no longer wearing the hoodie or the mask. He and Coffman sat there and looked at each other for 30 seconds. Coffman identified the man sitting in the white vehicle as Green.[4]

Coffman and Green drove their respective vehicles out of the driveway. Coffman noticed the white vehicle had paper plates that said "Fiesta Motors" on them. Coffman drove back to Kimmy's Nails to find out what had happened and learned there had been a robbery.

Deputy Mike Mason of the San Bernardino County Sheriff's Department responded to the robbery report. He interviewed witnesses and reviewed video surveillance.[5] He spoke with Yousef Bagherdai, the owner of the Fiesta Motors used car dealership in Ontario, and learned that in May 2012, Bagherdai loaned the white vehicle driven by Green that night to Green's father, Nathan Green, who had provided tax services to his business. Bagherdai gave Nathan Green the white car, transferring it to his name, in February 2013. During the time the white car was on loan to Nathan Green, Bagherdai received a red light ticket in the mail with a photograph showing Green driving the car. That photograph, which was taken in June 2012, showed the vehicle had license plates on it.

_____

[3] Coffman reported to a police officer that the face covering was not a mask but a bandana-type covering that had a leathery texture.

[4] During the robbery investigation, Coffman identified Green in a six-pack photographic lineup as the man he had seen in the white vehicle.

[5] Mason was unable to preserve the video surveillance.

4

Mason obtained the license plate number for the vehicle from Bagherdai and obtained Nathan Green's address. Mason went to that address after he was notified by other officers that Green had arrived there, driving the vehicle. Mason spoke with Nathan Green and searched the common areas of his home; Mason found two knapsack-style bags in the garage. Mason searched the vehicle, which had Fiesta Motors paper plates on its front and back, and found on the front passenger seat a pair of black gloves with the fingers torn.

Green admitted to Mason that he had been driving the car for a few months. He admitted being in the area of Kimmy's Nails the previous evening, and specifically stated he had parked the car in the parking stall where Coffman saw him. Green explained he was in the area, but he said he never got out of the car.

Mason went to the motel room where Green was staying and found a black bandana-style item, a black sweatshirt, and a red light camera photograph.

*Green's Testimony*

Green testified that in May 2013, he was self-employed and also worked with his father's accounting business. The evening of the robbery, Green was trying to find a business related to his recycling business. He was in the vicinity of Kimmy's Nails because he was attempting to reestablish a business relationship with a business in the area. He parked the car in the parking lot where Coffman would eventually see him, but never got out of the car. Green testified that that evening he had seen "a suspect," wearing dark-colored clothing, including a hoodie, and a ski mask, run through the parking lot. He eventually drove to the business, with which he hoped to reestablish ties, found it was closed, and drove to his parents' home.

Green testified that neither the gloves found in the car nor the black sweatshirt found in his motel room was his, but had been "planted." The "real" license plates for the car were in its trunk.

5

Green admitted to committing a robbery in 1995 and grand theft in 2005 "concerning [his] business."

PROCEDURAL HISTORY

I.

GREEN IS CHARGED WITH ROBBERY AND ATTEMPTED ROBBERY; THE FIRST AND SECOND *MARSDEN*[6] HEARINGS.

In June 2013, Green was charged in an information with one count of second degree robbery and two counts of attempted second degree robbery. The following month, Green requested the first of six *Marsden* hearings[7] that he would request within a 10-month period in the trial court. He informed the court that he felt his court-appointed attorney was "trying to force [him]" to take a plea deal and threatening that the prosecutor was going to file a firearm enhancement allegation. He further stated the lead detective was manipulating witnesses, and manufacturing and planting evidence. Green said he was "extremely concerned" that his attorney did not look at his notes at the preliminary hearing, particularly regarding inconsistencies he had found in the police report, and felt she was not "in tune" with the "racial implications" in the case.

The court listened to Green's attorney's statements, including that she had only advised Green of his potential exposure in the case, did not coerce him to plead guilty, and had thoroughly reviewed the police report with him. The trial court found Green's attorney had and would continue to properly represent Green and there had not been a breakdown in the attorney-client relationship.

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[7] Green does not argue on appeal that the trial court erred by denying any of his *Marsden* requests to replace appointed counsel. We review Green's *Marsden* requests and respective hearings to the extent they are relevant to the issues presented in this appeal.

Later that same month, Green requested a second *Marsden* hearing. The court granted Green's request that appointed counsel be replaced and appointed conflict panel attorney Gary Ablard to represent Green.[8]

## II.

### JURY SELECTION; THE THIRD AMENDED INFORMATION; GREEN'S FIRST *FARETTA* REQUEST.

On August 8, 2013, jury selection began. That morning, Green stated to the court: "I am having some communication issues with my attorney, Mr. Ablard. I request time, obviously, to discuss particular matters or concerns that I have with him as being my attorney and he gives me the impression—I could be very, very, very, very wrong— but I always get the impression he doesn't have the time and he doesn't want to have discussions with me."

The trial court responded: "But this isn't ringing true to me, so that's why I am interrupting. Yesterday when you were here you wanted 10 or 15 minutes to speak with him. I saw it was more like a half hour instead of 10 or 15 minutes at the conclusion of our hearing yesterday. Mr. Ablard already put on the record yesterday all the time that he and his investigator Glenn had been spending with you, sir, so there doesn't seem to be a problem in the Court's eyes. Not that you are being inappropriate, you are not. I just don't see a problem and it is time for trial to continue and so we are going to start picking a jury in a few minutes."

Green then asked, "[i]f I have issues that I need to discuss with regard to my case and Mr. Ablard is my attorney, how do I go about—." The court responded, "[y]ou work it out with Mr. Ablard." Ablard informed the court that he had received from Green a counteroffer to a pending plea bargain offer. Ablard explained to the court

---

[8] The transcript of that hearing was not made available to the prosecution and is not included in our record.

that he recommended that Green accept the prosecution's offer of six years, given that Green's exposure was more than 20 years. Green claimed that he had been offered a plea deal that involved less than six years, which had not been communicated to him by his previous attorney. Green communicated his counteroffer which was rejected by the prosecutor. Green requested to be cocounsel. The trial court told Green that he could assist Ablard as a defendant but not as cocounsel.

On August 12, 2013, Green was charged in a third amended information with one count of attempted second degree robbery, in violation of Penal Code sections 664 and 211 (count 1); one count of second degree robbery, in violation of section 211 (count 2); and one count of assault with a firearm, in violation of Penal Code section 245, subdivision (a)(2) (count 3). The third amended information alleged as to counts 1 and 2, that Green personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b), and as to count 3, that he personally used a firearm within the meaning of Penal Code section 12022.5, subdivisions (a) and (d). The third amended information also alleged Green had a prior strike in the form of a 1995 robbery conviction in Arkansas.

On August 12, the jury was selected and, the next day, Green asked the court to be allowed to represent himself, claiming Ablard was unprepared for trial. The trial court and Green engaged in the following colloquy:

"The Court: All right. And, just for the record, why would you like to do that now after we selected the jury and testimony is about to begin in a case that is going to take about two days?

"[Green]: It has nothing to do with the jury, Your Honor. The time that was invested between me and Mr. Ablard, my attorney, I feel was highly insufficient for him to be able to properly represent me.

"The Court: I see. But you are ready to represent yourself?

8

"[Green]:  Yes, sir.  I believe I am more adequately prepared to represent myself, knowing the police report in totality more than Mr. Ablard.  It has nothing to do—there is no prejudice against Mr. Ablard whatsoever.  Just a matter of preparation and lack thereof.

"The Court:  I am going to respectfully deny the request.  I don't feel it's timely.  I don't feel that it's warranted under any circumstance.  I think, rather, it possibly might be more manipulative.  I noticed there has been a *Marsden* hearing already in this case not long ago where Judge Reichert replaced the Public Defender.

"[Green]:  Yes, sir.

"The Court:  There was a request by you, sir, to be a co-counsel which also was respectfully denied, and at this point in time, I don't find that the request is appropriate under the circumstances in the middle of trial.  And perhaps I don't feel it's so genuine because Mr. Ablard is very prepared.  He's always been prepared.  He has an investigator that's been here.  I saw them.  They were with you this morning.  I have no doubt, nor do I have anything contrary to tell me, that Mr. Ablard somehow needs more time to get on top of this any more than he is right now.  So I think that he's ably representing you.  He will continue to ably represent you.  As I say, your request is respectfully denied."  (Italics added.)


III.

THE JURY FINDS GREEN GUILTY OF COUNTS 1 AND 2 AND ASSAULT, AND FINDS THE FIREARM ENHANCEMENT ALLEGATIONS NOT TRUE; THE THIRD *MARSDEN* HEARING.

On August 16, 2013, the jury found Green guilty of counts 1 and 2.  The jury found him not guilty of assault with a firearm as charged in count 3, but found him guilty of the lesser included offense of simple assault.  The jury found all the firearm enhancement allegations to be not true.

9

Three days later, before trial on the prior strike conviction allegation began, Green requested that Ablard be replaced. A third *Marsden* hearing was held. Green stated that Ablard did not tell him that he could get a haircut before trial, causing the prosecutor to make "very degrading and racial remarks about [his] appearance directly to the jury" and to suggest Green was trying to alter his appearance as a disguise. The court explained to Green that the prosecutor's comments were not racial. Green reiterated that Ablard was not prepared for trial.

The court denied Green's request that Ablard be replaced. The court pointed out that the firearm enhancement allegations that carried a mandatory 10-year per count prison term were found not true because Ablard convinced the jury there was insufficient proof of a real gun. The court further stated that Ablard did a fine job and the court watched Green assist him. The court noted Green was able to testify on his own behalf and say whatever he wanted to say.

Green asked the trial court what his options were in having Ablard removed as counsel. The court stated, "I am not removing him from your representation. I am not going to have you represent yourself at this point because I think it's untimely, and I think it's manipulative. I don't agree with your reasoning as to why you want to replace Mr. Ablard, so I can't see representing yourself is anything other than a disingenuous way to move forward. I'm sorry about that, but that's the way it is. It's untimely."

Green asked about hiring an attorney and the court said that was always a possible option and Green had time to do so before the sentencing hearing. The court concluded, "[b]ut right now I am going to find there's no deterioration, there's no breakdown in the relationship, other than Mr. Green's notions that he has; that the Court doesn't find persuasive as to why Mr. Ablard should be replaced. I understand what you are saying. I just don't agree with it, respectfully."

10

## IV.

THE TRIAL COURT FINDS THE PRIOR STRIKE CONVICTION ALLEGATION TRUE; ABLARD REQUESTS TO BE RELIEVED AS GREEN'S COUNSEL IN LIGHT OF THE MOTION FOR A NEW TRIAL GREEN WISHED TO FILE; THE TRIAL COURT APPOINTS GEOFF NEWMAN.

The trial court found the prior strike conviction allegation true.

In October 2013, Ablard requested that the trial court relieve him from representing Green because he wanted a new trial motion filed and a conflict had developed between them, relating to that motion. The court appointed conflict panel attorney Geoff Newman to serve as Green's counsel.

In November 2013, Green stated to the trial court: "I've told Mr. Newman that I have proof that I was set up, and I need that to be addressed prior to any kind of mistrial and into January." He stated he had told Newman of evidence that had been planted and asked Newman to contact an agency called the "Inland Regional Corruption Task Force." The court told Green he had an excellent lawyer and "[w]hatever you are doing, that's up to you."

## V.

NEWMAN FILES GREEN'S NEW TRIAL MOTION; THE FOURTH *MARSDEN* HEARING; GREEN MAKES FURTHER *FARETTA* REQUESTS TO REPRESENT HIMSELF.

In January 2014, Newman, on behalf of Green, filed a new trial motion, raising arguments involving ineffective assistance of counsel, wrongful denial of his *Faretta* request, and a verdict that was contrary to the evidence. At a hearing, Green stated he was "not happy with the motion." Newman explained he refused to do the civil work that Green had requested. Green requested another *Marsden* hearing.

Three days later, the court conducted Green's fourth *Marsden* hearing. The court asked Green why he wished to replace Newman as counsel. Green replied, "[f]or lying," explaining that in November, Newman said he was not Green's attorney. He

11

complained that Newman was not communicating with him. The court explained that Newman was appointed specifically for the purpose of considering bringing a motion for a new trial on Green's behalf. Newman informed the court that Green had asked him to send letters to a number of agencies, reporting alleged corruption, and talked about suing the county for civil rights violations, all of which are outside the scope of his representation. The court explained that just because Newman would not do something that Green wanted him to do does not mean they are miscommunicating. The court found no breakdown in their relationship and nothing showed Newman was unable to represent Green "in the excellent way that he represents all people who [the court] ha[s] seen him represent which have been numerous."

At the end of the hearing, Green asked, "[c]an I represent myself?" The court responded: "No. We are not going to deal with that. I find it to be manipulative, highly manipulative." The court further stated, "[s]imply a transparent attempt right now because you are not getting your way, you are not getting people to do what you want, that, okay, well, in that case then let me just represent myself."

In February, Newman informed the trial court that Green wished to represent himself. The court informed Green that a response had been filed to his motion for a new trial and the court had asked counsel to file a brief regarding striking his prior strike conviction for purposes of sentencing. The court explained it wanted to be reminded of the circumstances of the Arkansas case. Green stated that he had wanted to represent himself since the first day of trial and he had proof of "outrageous misconduct" by the police and "vindictive prosecution."

The court responded: "I am going to deny your request to represent yourself for the following reasons: First, I think it's untimely. We are past the point where we should have been for sentencing already. There's been a motion for new trial already filed on your behalf by Mr. Newman. We've had now four *Marsden* motions in the last seven to eight months filed by you. I believe that I have listened to you, and

12

either you and/or Mr. Newman have indicated some of the bases for your concerns, and I have listened to them, and I understand they relate to but aren't limited to outrageous police conduct, outrageous conduct by the District Attorney, the planting of evidence . . . [¶] . . . [¶] . . . denial of due process.  I think you even said I was prejudice[d] at one point or something.  . . . It's the Court's belief that your request to now represent yourself at this late hour is for dilatory reasons.  It's manipulative.  I don't think it's sincere and genuine.  And I am not going to grant the request at this time.  You are ably represented by Mr. Newman who is ready to present the motion for new trial at least.  I told you this morning he's also going to be working on a *Romero* motion which is to your benefit, and we were going to continue the matter for a period of time so that all of these things could be appropriately considered and so that you can be afforded every inch of due process that you are entitled to and that you have already been awarded.  So I am respectfully denying the request to represent yourself at this time, sir."  (Italics added.)

Green asked for another *Marsden* hearing because he was not prepared at the last *Marsden* hearing.  Newman said he was ready to proceed on the legal issues in the case and move forward.


VI.

THE FIFTH *MARSDEN* HEARING AND FURTHER *FARETTA* REQUEST.

Green's fifth *Marsden* hearing was held four days later.  Green informed the trial judge that he had written three letters to the presiding judge, "that detail blatant gross mishandling of my case as you being the overseer of my case."  He also stated, "[i]n addition, I am also going to be contacting the California State Bar to have a supervisor in the complaint department contacted to find out how, while I am incarcerated, to file a formal complaint against [his first appointed counsel], Mr. Gary Ablard, and also Mr. Geoff Newman as well."  The court stated it appreciated Green's

13

statements but redirected Green to the issues related to the *Marsden* hearing and asked him if there was anything new.

Green cited Newman's alleged lack of communication in representing him, Mason's alleged corruption of which Green claimed to have "physical proof," and the prosecutor's filing of "false charges." He also claimed he had written Newman six letters and had left phone messages all of which were unanswered.

Newman acknowledged receiving at least six letters from Green, all asking the same things. He also said he had multiple discussions with Green in court, explaining why he did not want to do something a certain way, but Green continued to write letters raising the same issues.

Green asked, "why do you not give me my right to go pro per?" The trial court denied Green's request to replace counsel and to represent himself, stating, "listening to you speak and your reasoning, it is clear that you just wish to delay the proceedings, you wish to pursue things that are totally outside the scope of the trial, the sentencing, i.e., for example, that law enforcement has set you up." The court further stated, "if I were to just let you have your way, that's what we would be doing. We would never get [to] sentencing."

VII.

THE SIXTH *MARSDEN* HEARING; GREEN MAKES ANOTHER *FARETTA* REQUEST;
THE TRIAL COURT SUSPENDS CRIMINAL PROCEEDINGS AFTER GREEN SUBMITS AN
AFFIDAVIT OF PREJUDICE AGAINST THE TRIAL JUDGE.

After Newman filed a *Romero* motion on Green's behalf, Newman informed the court, "we do want a *Marsden* motion now" (italics added). At Green's sixth *Marsden* hearing, Green accused Newman of a "gross lack of communication" and "gross ineffective assistance of counsel." Green accused the trial court of being racist. Newman reiterated his conversations with Green and how those conversations ended

14

when they turned from discussions about the case to personal insults about Newman. Newman stated the issue was not a lack of communication, but his telling Green things he did not want to hear. Newman stated he was representing Green, and doing everything he could for him, "to the best of [his] abilities, despite Mr. Green himself."

The trial court denied Green's request to replace Newman, explaining that Newman knew what Green cared about (Green agreed to that point), he is an excellent criminal defense lawyer, and he would not do something that would hurt Green's case. The court stated that at the then-current stage of the proceedings with a pending *Romero* motion and motion for a new trial, it "would be in dereliction of my duty if I were to replace Mr. Newman at this point based on your comments which [are] essentially coming down to he's not doing what [Green] ask[s] him."

Green responded, "I want me." The court stated that in addition to the request being untimely, inappropriate, and disingenuous, there was no reason at that point in the proceedings to allow Green to represent himself. The court stated, "it's simply an expression of I am not getting my way, people aren't doing what I want, and, therefore, I want to represent myself. And, therefore, at this stage of the proceedings, there is really nothing more you could do. However, I understand that you think there's evidence out there that might exonerate you." The court set a hearing to address whether any such evidence existed.

Green handed the bailiff an affidavit of prejudice against the trial judge. The court accepted the affidavit and suspended the criminal proceedings.

VIII.

CRIMINAL PROCEEDINGS ARE REINSTATED; THE NEW TRIAL AND *ROMERO* MOTIONS ARE DENIED; GREEN IS SENTENCED TO SIX YEARS IN PRISON; GREEN APPEALS.

After a different judge denied the motion to disqualify the trial judge, on May 9, 2014, criminal proceedings were reinstated. The trial court denied the new trial

15

motion and the *Romero* motion and sentenced Green to a total of six years in prison. Green appealed. [9]

## DISCUSSION

### I.

### THE TRIAL COURT DID NOT ERR BY DENYING GREEN'S UNTIMELY AND EQUIVOCAL *FARETTA* REQUESTS; EVEN IF THE TRIAL COURT ERRED, ANY SUCH ERROR WAS HARMLESS.

Green argues the trial court erred by denying his *Faretta* requests. In a footnote in the opening brief, Green states that although his argument "focuses largely upon his initial *Faretta* motion, [he] maintains that the trial court erred in denying each such subsequent motion as well."

"A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including sentencing. [Citations.] The right to counsel may be waived by a criminal defendant who elects to represent himself at trial. [Citation.] The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins. Otherwise, requests for self-representation are addressed to the trial court's sound discretion. [Citation.] Moreover, whether timely or untimely, a request for self-representation must be unequivocal. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 453.)

"On appeal, a reviewing court independently examines the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 453.) "The trial court's discretion to deny a motion made at the commencement of trial or later exists to 'prevent

---

[9] Our order summarily denying Green's petition for a writ of habeas corpus, case No. G052923, is filed this same date.

16

the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.] It follows ineluctably that where self-representation is requested for a legitimate reason, where there is no request for a continuance and where there is no reason to believe there would be any delay or disruption, the trial court's denial of a *Faretta* motion is an abuse of discretion." (*People v. Nicholson* (1994) 24 Cal.App.4th 584, 593; see *People v. Valdez* (2004) 32 Cal.4th 73, 103 ["'In exercising this discretion, the trial court should consider factors such as "'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.'"'"].)

## A.

### Green's First Faretta Request Was Untimely.

"In order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial. The latter requirement serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. [Citation.] If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay. [Citation.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1110 [motion made on the day trial was scheduled to start was untimely]; see *People v. Frierson* (1991) 53 Cal.3d 730, 740, 742 [motion untimely when made two days before trial]; *People v. Moore* (1988) 47 Cal.3d 63, 78-79 [motion untimely when made Friday before trial was scheduled to begin the following Monday].)

Green's first request to represent himself was made after the jury had been selected. It was therefore untimely and it was within the trial court's discretion whether to grant or deny his *Faretta* request.

17

B.

*The Trial Court Did Not Abuse Its Discretion in Denying Green's Faretta Requests, and Even If It Had, Any Such Error Was Harmless.*

In *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002, the California Supreme Court held the "right of self-representation is not a license to abuse the dignity of the courtroom or disrupt the proceedings. [Citation.] *Faretta* motions must be both timely and unequivocal. Otherwise, defendants could plant reversible error in the record. [Citations.] Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration."

Our record is replete with examples of Green's alternating requests between requests for new counsel and for self-representation, starting with his first *Marsden* motion in early July 2013, through his motion on April 9, 2014, to replace Newman as counsel, who was his third attorney in this case, and to represent himself. The trial court repeatedly made findings, throughout this period of serial *Marsden* hearings and *Faretta* requests, that Green's requests were disingenuous and highly manipulative.

The transcripts from those hearings show repetitive demands by Green that the trial court and appointed counsel research, consider, and/or address issues that were not properly before the court, such as his alleged civil claims against law enforcement and the district attorney's office. They further show the trial court repeatedly having the same conversation with Green about why his *Marsden* hearing and/or *Faretta* requests would not be granted. Although Green never expressly requested a continuance, the record shows Green's requests caused delays and were otherwise calculated to disrupt the trial court proceedings, including sentencing.

The record also shows that the trial court considered and analyzed the quality of appointed counsel's representation of Green throughout the proceedings. In August 2013, the court observed that Ablard had been very prepared for trial, and always

18

had been prepared. The court found that Ablard had been "ably representing" Green and would continue to do so. After trial, the court pointed out that Ablard's representation resulted in the jury finding the firearm enhancement allegations not true.

After Ablard was replaced by Newman as Green's counsel, and Green requested *Marsden* hearings and made *Faretta* requests, the trial court noted that Newman would represent Green in the excellent way the court had observed him represent all his clients in the courtroom. Newman filed a motion for new trial and a *Romero* motion on Green's behalf.

Even if the trial court erred by denying any of Green's *Faretta* requests, any such error was harmless. Green testified in his own defense without limitation. The jury found all of the firearm enhancement allegations not true and found Green not guilty of the assault with a firearm charge, but guilty of the lesser included offense of assault, notwithstanding eyewitness testimony that the robber appeared to have an automatic firearm in his hand.

As for the posttrial proceedings, Green directly conversed at length with the trial court during the course of his multiple *Marsden* hearings and *Faretta* request discussions. It is difficult to fathom that there remained any uncommunicated arguments or issues that Green wished conveyed to the court; Green does not argue otherwise in his appellate briefs. The trial court sentenced Green to a six-year prison term by imposing the middle term on count 2, doubled because of the prior strike conviction, and a concurrent middle term sentence on count 1. Thus, Green's sentence was significantly less than what he faced at the beginning of trial.

In his opening brief, Green contends that had he been permitted to proceed in propria persona, he might have obtained evidence that would have exonerated him. Green's argument is unsubstantiated speculation; he failed to show a reasonable probability of achieving a better result absent any alleged error in the trial court's denying his *Faretta* requests.

19

Green also argues that because the evidence presented at the court trial on his 1995 robbery conviction in Arkansas "contained different names and different birthdates, there was no fingerprint match, and no photo match, [Green] argued that it was not him." But Green admitted during his jury trial that he had been convicted in 1995 of robbery.

Finally, Green argues, "there was nothing suggesting that the Arkansas conviction could be considered a strike." For the reasons discussed *post*, we reverse the trial court's finding that Green's 1995 Arkansas robbery conviction constituted a strike. Consequently, Green has not suffered prejudice on that ground either. The trial court did not abuse its discretion by denying Green's *Faretta* requests.

II.

THE TRIAL COURT DID NOT ERR BY ALLOWING THE PROSECUTOR TO ELICIT FACTS SURROUNDING GREEN'S PRIOR FELONY CONVICTION FOR GRAND THEFT.

Green argues that the trial court abused its discretion by "allowing the prosecution to elicit facts surrounding [Green]'s prior felony conviction for grand theft because he 'opened the door.'" (Boldface & capitalization omitted.) We review claims of evidentiary error for an abuse of discretion. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 740.)

Evidence Code section 788 provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." Courts have interpreted section 788 to limit the admission of evidence of a prior felony conviction to the name or type of crime and the date and place of conviction. (*People v. Allen* (1986) 42 Cal.3d 1222, 1270; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267; *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462.)

20

Subdivision (i) of Evidence Code section 780 permits a trial court to admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the "existence or nonexistence of any fact" about which a witness has testified or "opened the door." (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946 ["[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony."].) The open-the-door rule prevents witnesses from misleading the jury or minimizing the facts. (See *People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283; *People v. Shea*, *supra*, 39 Cal.App.4th at p. 1267 ["if in 'admitting' the prior felony conviction 'the defendant first seeks to mislead a jury or minimize the facts of the earlier conviction [citation] he [or she] may properly be questioned further"].)

Here, during direct examination, Green minimized the circumstances of his conviction for grand theft and thereby sought to mislead the jury; he therefore opened the door to the prosecutor eliciting facts about the circumstances of that offense.

After the prosecution completed its case-in-chief, Green's trial counsel informed the court that Green wished to testify. A hearing was held regarding whether Green's prior convictions might be used for impeachment purposes. The trial court ruled that Green could be impeached with his conviction in 2005 for grand theft, and for his conviction in 1995 for robbery in Arkansas. The court further ruled that the prosecutor would be allowed to elicit the names of the prior convictions (grand theft and robbery), and the dates of those convictions.

During his direct examination, Green testified about working with his father's business, and also had his own recycling business. Regarding his prior convictions, he testified as follows:

"Q In 1995 you had a robbery?

"A Yes, sir.

21

"Q  How old were you back in 1995?

"A  I had to be somewhere in my twenties.

"Q  Okay.  Was that before you started your businesses up?

"A  Far before that, sir.

"Q  And in 2005 you had a theft case?

"A  That's correct.

"Q  Wasn't a robbery.  It was a theft case?

"A  That's correct, *concerning my business*."  (Italics added.)

During cross-examination, the prosecutor asked Green about his prior conviction for grand theft, as follows:

"Q . . . You indicated when [Green's trial counsel] asked you about your Grand Theft, that just happened in 2007—2005, you indicated that that was concerning your business?

"A  A business—yes.  Not the recycling business.  It was a different business.  You are correct.

"Q  Okay.  So it was your dad's business?

"A  No, it was not."

The prosecutor asked Green, aside from his father's business and Green's recycling business, what other businesses he had owned.  Green responded that he had owned a grocery shopping and delivery service for low-income senior citizens, disabled individuals, and homebound individuals.  The prosecutor confirmed that it was in connection with that grocery shopping and delivery service that Green had been convicted of grand theft.

Later in his cross-examination, Green testified that Mason had planted evidence, such as the gloves found in the car he had been driving and the sweatshirt found in the motel room, "[t]o assist [the prosecutor] in [her] conviction."  Green's cross-examination continued as follows:

22

"Q  So I have—in your opinion, I have an interest in convicting you who is just an innocent person?

"A  I don't know if you personally do, but I do believe that the County of San Bernardino does, yes, ma'am.

"Q  Why do you think the County of San Bernardino would have an interest in doing that?

"A  For reasons of the prior case involving the Grand Theft which the only victim in that case was the county of San Bernardino.

"Q  So it's your testimony, sir, that the County of San Bernardino has it out for you, correct, and that's why Deputy Mason has planted evidence, and that's why I am unfairly prosecuting you?

"[Defense counsel]:  Compound.

"The Court:  It is compound.  Why don't you break it down into what seemed like two parts.

"Q  So it's your testimony, Mr. Green, that in your opinion the County of San Bernardino has it out for you, and that's why you are being prosecuted?

"A  I believe it is revenge.  Yes.

"Q  And also why I have an interest in prosecuting you?

"A  I do not know you personally.  I believe you are just on the case.  I never stated that you personally have a grudge or anything out after me.  You are just the person that's on the case.

"Q  Well, let me ask you this, Mr. Green.  Why, if your business was involving elderly, the disabled people, then how is the County of San Bernardino involved?

"[Defense counsel]:  Your Honor, I am going to object.  352.

"The Court:  Overruled."

23

Green testified that his company received funding from the County of San Bernardino and he would bill it for the services that his company provided. Green's testimony continued as follows:

"Q And you b[ille]d them, and basically you what? You stole from them, right?

"A No, that's incorrect.

"Q You weren't providing the food to the elderly?

"A We didn't provide food, ma'am. We provided the service.

"Q You didn't provide food to the disabled people?

"A No. We provided a service. We only grocery shopped. We purchased the food for them and delivered it to them, so we provided a service, not food.

"Q But obviously, Mr. Green, a case was filed against you, right?

"A Yes, ma'am.

"Q And you pled guilty, right? You indicated that you pled guilty, right?

"A Through the advice of my attorney at the time, yes, ma'am, I did.

"The Court: At this point I think you should be moving on please, [the prosecutor]."

After the defense rested, the trial court had a discussion with the prosecutor and defense counsel regarding defense counsel's objection about the prosecutor "moving into some of the factual background about the Grand Theft conviction." Defense counsel stated that he did not believe Green opened the door to the level of inquiry that ensued and he also asserted the foundational aspects of the theft case were "so prejudicial that that in and of itself would sway the jury." He argued the prosecutor was able to convey to the jury that although San Bernardino County was the victim, the theft involved food services and elderly people. The prosecutor responded that Green had opened the door because he untruthfully misled the jury to believe the theft had to do with a recycling business.

The court stated:  "I believe that the door was opened by the statement that you just made at least insofar as to find out what the nature of the business was, whether it was one of the businesses that Mr. Green testified to or a different business.  Once that began, Mr. Green once again opened the door further in talking about the County and so forth being out to get him.  And, frankly, as far as the Court is concerned, Mr. Green opened the door to the entire inquiry about the nature of that charge at a minimum by indicating that the motivation to plant evidence and to bring the prosecution against him was based on the fact that the County of San Bernardino was out to get him or for revenge and it related back to the fact that the County of San Bernardino was apparently a victim, so Mr. Green said, in the Grand Theft situation.  I allowed a little bit of latitude to explore that based on all of Mr. Green's answers as to motivations, planting of evidence, and so forth as related back to the County, and then I drew a halt to it when, as far as I was concerned, 352 of the Evidence Code raised a flag in my mind that we were heading into more prejudicial or at least more matters that were time-consuming unnecessarily, possibly more prejudicial than probative, and I drew a halt to that question.  But as far as I am concerned, Mr. Green opened the door to that type of questioning, and that's why I allowed it."

The trial court did not abuse its discretion by concluding that Green had opened the door to the prosecutor's line of questioning.  Therefore, Green's testimony regarding the facts surrounding his grand theft conviction was admissible under Evidence Code section 780, subdivision (i).  The court did not abuse its discretion by excluding that evidence under Evidence Code section 352, which gives the court discretion to exclude evidence if its probative value "is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The probative value of the evidence clarifying that Green's grand theft conviction was not substantially outweighed by any probability that evidence would

25

necessitate an undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. In fact, the prosecutor's continuing line of questioning enabled Green to communicate that it was the County of San Bernardino, not those persons for whom his company provided services, that was victimized by his crime. Green also denied having committed theft at all, stating he had pleaded guilty to grand theft on the advice of counsel.

Even if the evidence regarding the circumstances surrounding Green's grand theft conviction was inadmissible, its admission was not prejudicial. The erroneous admission of such evidence is examined for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Heckathorne*, *supra*, 202 Cal.App.3d at pp. 463-464.) Given the strong evidence of Green's guilt, including eyewitness testimony and materials from the crime found in Green's car and hotel room, it is not reasonably probable Green would have had a better outcome had the evidence of the facts of the grand theft conviction not been admitted.


III.

BECAUSE INSUFFICIENT EVIDENCE SHOWED GREEN'S ARKANSAS ROBBERY CONVICTION
QUALIFIED AS A STRIKE, WE REVERSE THAT FINDING.

In his supplemental opening brief, Green argues insufficient evidence supported the trial court's finding that Green's 1995 robbery conviction in Arkansas constituted a strike within the meaning of the Three Strikes law. In the supplemental respondent's brief, the Attorney General agrees with Green "because [Green]'s Arkansas robbery conviction does not contain all the elements of the California robbery offense."

Penal Code section 211 provides: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." The elements of robbery include "taking" which "consists of 'two necessary elements, gaining possession of the

26

victim's property and asporting or carrying away the loot.' [Citation.] Asportation is thus an element of robbery in California. (See *People v. Lopez* (2003) 31 Cal.4th 1051, 1054 . . . .)" (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 130.)

Section 5-12-102, subdivision (a) of the Arkansas Code Annotated defines robbery, as follows: "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person."

Unlike the crime of robbery in California, to prove a robbery occurred in Arkansas, the prosecution is not required to prove that a theft was actually accomplished. (*Carter v. State* (Ark. 2010) 364 S.W.3d 46, 51.) Because the Arkansas robbery statute does not require all of the elements of Penal Code section 211, as it does not require proof of asportation or that property was taken from the victim's immediate presence, the mere fact that Green was convicted of robbery in Arkansas in 1995 does not establish that it qualifies as a strike under the Three Strikes law.

The Attorney General concedes, "[o]ther than indicating the offense was a Class B felony under the Arkansas definition, there are no facts set forth in the record as to the robbery conviction. Thus, there is no factual basis to establish that the Arkansas robbery committed by [Green] would constitute robbery under the California statute." Thus, the trial court's finding that Green's 1995 conviction for robbery in Arkansas constituted a strike under the Three Strikes law is reversed for insufficient evidence.

It is well settled that if the jury's finding on a strike allegation is reversed on appeal for insufficient evidence, the allegation may be retried. (*People v. Barragan*, *supra*, 32 Cal.4th at p. 239.) In his supplemental opening brief, Green argues that because insufficient evidence supported the finding that the prior robbery conviction constituted a strike, "[i]t is therefore necessary to reverse and remand for a retrial as to whether [Green]'s Arkansas robbery conviction was a robbery or other serious felony

27

under California law." Because we reverse the strike finding, we do not reach Green's argument that the trial court erred by failing to grant his motion pursuant to Penal Code section 1385 and *Romero*, *supra*, 13 Cal.4th 497, to strike that prior conviction for sentencing purposes.

## DISPOSITION

The judgment of conviction is affirmed. The true finding as to the allegation that Green's prior robbery conviction constituted a strike under the Three Strikes law is reversed and the sentence is vacated. The case is remanded on that allegation if the People so elect to retry it, or for a new sentencing hearing if the People do not go forward on retrial of the allegation in a timely manner. After resentencing, the trial court shall prepare a modified abstract of judgment consistent with this opinion and forward a certified copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation.

FYBEL, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

MOORE, J.

28